GARDEN CITY v. GARDEN CITY TELEPHONE, LIGHT & MFG. CO.

(Circuit Court of Appeals, Eighth Circuit. October 3, 1916.)

No. 4658.

ELECTRICITY ⬤⟞11—ELECTRIC COMPANIES—REGULATION OF RATES—VALIDITY OF ORDINANCE.

In determining the validity of an ordinance fixing rates to be charged by an electric company, claimed to be unconstitutional as confiscatory, the capital on which the company is entitled to a fair return is the reasonable value at the time of the property being used in the service, and it is immaterial that such property was in part acquired or paid for out of previous earnings of the business, or whether or not previous rates were reasonable or excessive.

[Ed. Note.—For other cases, see Electricity, Dec. Dig. ⬤⟞11.]

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Suit in equity by the Garden City Telephone, Light & Manufacturing Company against the City of Garden City. Decree for complainant, and defendant appeals. Affirmed.

Richard J. Hopkins, City Atty., of Garden City, Kan., and F. Dumont Smith, of Hutchinson, Kan., for appellant.

W. P. Dillard, of Ft. Scott, Kan. (Harry Warren, of Ft. Scott, Kan., on the brief), for appellee.

Before HOOK and SMITH, Circuit Judges, and AMIDON, District Judge.

SMITH, Circuit Judge. The appellee, the Garden City Telephone, Light & Manufacturing Company, brought suit against the city of Garden City and the mayor, council, and city attorney of said city, to enjoin the enforcement of an ordinance fixing the rates and charges for the furnishing and supplying of electric light and electric current to the inhabitants of Garden City, passed August 5, 1912. The case was referred to a master, who reported that the complainant was entitled to the injunction sought. This report was confirmed by the District Court, and a perpetual injunction was granted as prayed, and the city of Garden City appeals.

The appellee is incorporated under the laws of Colorado and was authorized to do business in Kansas on January 3, 1907. The city of Garden City, Kan., was laid out in 1879. It became a city in 1886, and still remains a city of the second class. The federal census shows it had a population of 1,490 in 1890, 1,590 in 1900, and 3,171 in 1910. It is the practice of the Bureau of the Census to estimate the population between census periods by adding 10 per cent. annually of the growth in the last decade each year until the new census is taken. In July, 1908, the city of Garden City granted a franchise to the appellee which had bought the plant in 1907 from D. R. Menke. At the time this ordinance was passed the population of Garden City was probably about 2,850. The ordinance contained no rates to be charged. Very little, aside from the pleadings, the report of the master, and the various actions of the court, is preserved in our record. To illustrate: There is nothing to show what coal is worth at Garden City, the kind used by the appellee in producing current, and nothing to show how much coal was used; but it does appear how much was paid out for fuel per month. It appears that the appellee bought the plant, together with a gristmill, for $18,000. The man who made the sale testifies that this was $6,000 for the gristmill and $12,000 for the electric plant. It seems to be conceded that the machinery in the building used as a gristmill was removed and the building converted into a warehouse for the use of the electric light, power, and telephone business and a merchandise warehouse for articles used in connection with the telephone and electric light business. The exact value of the warehouse does not appear, much less the relative amount of its use given to the various lines of business conducted in it. C. D. Marsh, manager of the appellee, testified that all improvements, extensions, betterments, and repairs had.

been paid out of the earnings of the company from its telephone, light, and merchandise business and out of borrowed money, amounting to $4,500, and the auditor and bookkeeper of the appellee testified substantially to the same effect. The bill alleges that on June 6, 1912, and for more than a year prior thereto, the plaintiff had in effect charged its patrons and consumers in said city of Garden City, Kan., the following rates:

"1 to 75 kilowatt hours, 15c. per kilowatt hour. 75 to 150 kilowatt hours, 13c. per kilowatt hour. All over 150 kilowatt hours, 10c. per kilowatt hour. Customers using an average of 200 kilowatt hours or more per month, 10c. per kilowatt hour. Customers using an average of 500 kilowatt hours or more per month, 8c. per kilowatt hour. Minimum rate, $1.50 per month on metered service. Flat rates varied from 50c. to $1.00 per lamp per month, according to size of lamp and hours use of same. All night hall lights in business blocks, $1.50 per month."

The special master of the District Court reported that from the time of the appellee's franchise—

"down to the commencement of this suit, the plaintiff had in effect and charged for furnishing lights to the inhabitants of said city, 15 cents per kilowatt hour for current furnished, with a minimum rate of $1.50 per month on metered service. It does not appear to have had a special rate on current furnished for power and heat purposes."

The city of Garden City on June 6, 1912, passed an ordinance fixing the rates for electric light and current for power considerably lower than the ordinance now in controversy. Thereupon in June, 1912, the appellee filed a complaint with the Public Utilities Commission of the state of Kansas, praying that it investigate the matter, and that if it should be found that the rates were unreasonable and against the public welfare, or contrary to law, that it advise the city to make such changes in the ordinance as might be reasonable to meet the objections made. The case was heard by the Public Utilities Commission, and it was found that the electric plant had cost the appellee $60,973.83, including $5,785 paid to parties interested at the time of the purchase for which appellee received no value; in other words, that the plant had cost net $55,188.83. It also found that it would cost $51,051 to reproduce such a plant, and that the plant was worth 87.7 per cent. of its value new, and the present value of the plant was $44,772; that a new plant adequate for Garden City at the present time and for a number of years would cost $40,000; and taking into consideration all the conditions, including the intangible value, the value of the property used for the benefit of the city was $45,000. The Public Utilities Commission recommended a new schedule of rates, and its recommendation was incorporated in the ordinance in controversy of August 5, 1912. The case was referred to a special master, who found that the electric plant was worth $44,000, and this was confirmed by the District Court.

This suit was brought to enjoin the rates fixed by the ordinance: (1) Because they were alleged to be confiscatory under the Fourteenth Amendment; and (2) because they would not pay 8 per cent. on the amount of actual cash invested, in violation of section 1502 of the Statutes of Kansas of 1909, which provides:

"That said board of commissioners [of the city] shall at no time fix a rate which shall prohibit such person, firm or corporation from earning at least eight per cent. on the amount of its actual cash investment in such city over and above its reasonable operating expenses and expense for maintenance and taxes."

The bringing of an action upon these two grounds is supported by Louisiana R. R. Comm. v. Cumberland Tel. Co., 212 U. S. 414, 420, 29 Sup. Ct. 357, 53 L. Ed. 577.

There is a broad distinction between these two propositions. If a set of rates provide sufficient revenue after paying depreciation and all other expenses, so that the capital in the plant represented by stock and bonds will sell at par, it would be difficult to say where there has been any confiscation; but one would be loth to invest his capital, and take the perils of loss of it, if in case of success he could only get a barely nonconfiscatory rate. The state of Kansas has seen that it could not hope for development unless it allowed investors a more liberal rate, if they could make it, than a rate that scarcely escaped confiscation. Of course with whether the rate fixed by Kansas is a fair and reasonable rate we have nothing to do.

In the brief of appellant it is stated that the following are the only specifications of error relied upon:

"First. That the court erred in confirming the report of the master in the particular objected to, whereby the master took as the basis of a compensatory rate for the plaintiff the present cash value of the plant, and not the amount of cash actually invested therein by the plaintiff.

"Second. That the court erred in refusing to fix as a basis of the rates which the plaintiff might receive, the amount of cash actually invested by the plaintiff, but instead took as the basis of value upon which rates should be fixed the present cash value of the plant."

It is further stated in the brief of appellant:

"We contended that the words 'cash investment' meant the cash invested by the plaintiff, its own money; that it excluded any sums wrongfully extorted from the consumers by illegal rates and reinvested; that it excluded depreciation funds reinvested as capital."

The master found the depreciation would be 6 per cent. per annum. The appellant thinks 4 per cent. would be adequate; but it says in its brief:

"But we have not brought up the evidence on that point, and shall agree, for the purpose of this argument, that a 6 per cent. depreciation fund is proper, * * * and we shall assume, for the purpose of this argument, that 8 per cent. is a proper return."

These quotations seem to narrow the issue. In the absence of controlling authorities upon the question as applied to the electric light or current companies, we shall assume that, like other quasi public corporations, in the absence of any rate fixed by law, the company was only entitled to collect reasonable charges for use of electric light and current. 12 Ruling Case Law, 896; 1 Moore on Carriers (2d Ed.) 165; 3 Moore, 1780; 20 Cyc. 1165. It is in effect claimed that the appellee must have charged excessive rates for the early years of its existence, when no charges were fixed by law, and

invested these unjust exactions in the plant, and is now seeking to receive a return upon those illegal exactions.

No judicial authorities are cited on this point. In the first place there is no evidence that the company ever charged excessive rates until about the commencement of the controversy out of which this litigation arose; but, if it did so, the various parties from whom they were extorted had a cause of action against the company to recover the excessive rates until the statute of limitations had run. Presumptively they were not the identical persons who are now the consumers from the appellee. It is the practice of courts to try cases one at a time, and if the appellee has put money into the development of the plant, the court in this case could not stop to inquire just how it acquired the title to the money. Such a system would involve an investigation into the wholly collateral matter of the entire past life of litigants and the manner in which they acquired the money invested in a private enterprise.

It is conceded that the appellee has never paid any dividends, and, as already stated, appellee has borrowed $4,500 and paid for the development out of the earnings of the electric light business, and from the telephone business, in which it has about $50,000 invested, and from its merchandise earnings. We cannot find, in the absence of the evidence taken before the master, that the plant was worth less than $44,000, and a fair annual depreciation is, under the concession of appellant, $2,640. At the rates charged, exclusive of the street lights, which have now been taken over by the city plant, the receipts from the electric light plant for the years 1911, 1912, and 1913 were $36,492.35, and the necessary expenses were $20,834.39. Adding the depreciation, at $2,640 per year for three years $7,920, we find the net revenues of the three years were $7,737.96, or $2,579.32 per annum, or less than 6 per cent. upon the value of the plant.

The new ordinance reduced the rates nearly one-third. This means a loss in the absence of offsetting gain, as nearly as can be told from the evidence, of over $3,400 per year. It thus appears that, in the absence of an increase of business, the plant must be conducted at a net loss of $900 a year and all interest upon the plant be lost. In the years in question the appellee had a practical monopoly of the business of furnishing electric light and current to the inhabitants of the city. Now the city has constructed an independent municipal plant, and is actively competing with the appellee for all business, and the prospect for the appellee's future business is indeed gloomy.

We have carefully examined the whole case, and can but find that the rates fixed are confiscatory under the Fourteenth Amendment, entirely aside from section 1502 of the General Statutes of Kansas for 1909. This would have been a close case upon this question, if the city of Garden City had not founded a competing plant, and taken over the street lights, and competed for all other uses of current. In the Minnesota Rate Cases, 230 U. S. 352, 434, 33 Sup. Ct. 729, 754 (57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18) the court quoted with approval the statement that:

"What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property *at the time it is being used for the public.*"

As it seems clear that the rates fixed would be confiscatory under the federal Constitution, it seems almost unnecessary to say anything as to section 1502 of the Revised Statutes of Kansas, and we are loth to consider that subject, as the statute has never been construed on the point in question by the Supreme Court of Kansas. There is nothing to indicate whether the holdings of the appellee have appreciated or depreciated in value; but it appears that the only items of assets carried on the books which can refer to real property are: Building, $3,000; real estate, $4,300; and station, $2,740.26. The rest of the value of its assets must have been invested by the appellee, and it does not seem to us that we should investigate where the company got the money that it invested. As this question must ultimately be determined, however, by the Supreme Court of Kansas as to the true construction of the statute of Kansas, and as we hold that it clearly appears that the rates fixed were confiscatory, we need not say more upon this subject, except that in our judgment, and in the absence of an adjudication by the Supreme Court of Kansas, we think the rates are not only confiscatory under the fourteenth Amendment, but unreasonable under the statute of Kansas.

In view of the conclusion reached, it seems unnecessary to give great consideration to the motion which has been filed to dismiss this appeal. It will be overruled, and the decree of the District Court is affirmed.