## OKMULGEE GAS CO. v. CORPORATION COMMISSION.

No. 12873—Opinion Filed April 17, 1923.

Rehearing Denied October 9, 1923.

(Syllabus.)

1. **Gas—Duties of Corporation Commission in Rate-Making.**

Duties of Corporation Commission in making gas rates: (a) The ascertainment of the fair value for rate-making purpose of the property of the gas company used and useful in furnishing gas to its patrons; (b) the fixing of the rate or per cent. the gas company should receive on the present fair valuation of its property after deducting cost of operation and any other legitimate expenses; (c) the amount per thousand cubic feet to be paid by consumers in order to raise the necessary funds to pay all costs and expenses and the compensation to be received by the gas company.

2. **Corporation Commission—Rate-Making — Scope of Review of Orders of Commission.**

The fixing of rates is not a judicial function, and the right to review the conclusions of a board with legislative power such as that exercised by the Corporation Commission, is limited in determining whether the board acted within the scope of its authority, or the order is without foundation in evidence, or a constitutional right of the public utility has been infringed upon by fixing rates which are confiscatory or insufficient to pay the cost of the service and return to the utility a reasonable profit, on the investment. Muskogee Gas & Electric Co. v. State et al., 81 Okla. 176, 186 Pac. 730.

3. **Same—Rule for Ascertainment of Value of Utility.**

As a general rule, to determine the value of a small public utility property, what it would cost to reproduce the property less accrued depreciation is the safest and most certain method of obtaining present fair value upon which such utility is entitled to a return.

4. **Same.**

The equitable rule to be followed in the ascertainment of the present fair value of public utility property by resorting to the method of "cost of reproduction less accrued depreciation," is to give due consideration to the history and circumstances under which the utility property was created, and the prevailing prices of material and labor at the time of the investigation, and determine the fair average price of materials and labor necessary for the reproduction of the property. Pursuant to this method and the application of sound judgment and common sense, impartial tribunals will discharge the duty in the ascertainment of such values so as to insure the public utility a fair return upon the present value of its property and the patrons a reasonable rate for the services rendered.

5. **Same — Allowance for Improvements.**

Necessary additions or improvements should be valued at the cost price without deductions for probable reduced future prices.

6. **Same—Going Concern Value, Etc.**

The allowance by the commission of 20 per cent. to cover the items of going concern value, working capital, contingencies, held to be reasonable.

7. **Same — Adequate Rate.**

In determining the adequacy of a rate the public utility will be held to be entitled to a fair return on the present value of its property used and useful in serving the public, and it is immaterial that such property was in part acquired or paid for out of previous earnings of the business, or whether or not previous rates were reasonable or excessive.

**8. Gas — Rate-Making — Allowance for Depreciation.**

In fixing the rate of depreciation or for amortization, the commission should take into consideration the present life of the plant, if it be a small natural gas plant, and such depreciation allowed as would return to the investors their money over the probable period of the life of the plant, considering the average number of years the plant had been in service and the probable life of the same.

**9. Same — Reasonable Allowance for Amortization and Return.**

The allowance of five per cent. for amortization and eight per cent. for return on investment held to be reasonable.

**10. Same — Corporation Commission — Jurisdiction — Private Property Devoted to Public Use.**

Section 1, c. 93, Session Laws 1913, vests the Corporation Commission with jurisdiction to regulate the price at which every corporation, association, company, individuals, etc., may furnish the public with heat or light with gas. Held, that private property devoted to public use is subject to public regulation.

**11. Same — Right to Increased Rates.**

Record examined, and held, that the Corporation Commission erred in denying the application of appellant for an increase in gas rates.

Appeal by the Okmulgee Gas Company from an order of the Corporation Commission denying its application for an increase in gas rates. Order entered fixing rate, and cause remanded, with directions.

Ames, Chambers, Lowe & Richardson, for appellant.

E. S. Ratliff, for Corporation Commission.

KENNAMER, J. This is an appeal from an order of the Corporation Commission entered February 5, 1922, upon an application of the Okmulgee Gas Company to increase its gas rates in the cities of Okmulgee and Morris. The appellant's assignments of error, in substance, are as follows:

(1) The commission erred in its findings in the value of appellant's property used and useful in rendering the public service.

(2) The commission erred in its findings of the operating expenses of the appellant, including its estimate of the loss of gas which it charged to operating expenses.

(3) The commission erred in making a rate inadequate to produce a sufficient return to pay interest upon a proper valuation of the property, depreciation, and operating expenses.

In our view of this case, the duties of the Corporation Commission in passing upon the application of the appellant for an increase in rates are:

(1) The ascertainment of the fair value for rate-making purpose of the property of the gas company used and useful in furnishing gas to its patrons;

(2) The fixing of the rate or per cent. the gas company should receive on the present fair valuation of its property after deducting cost of operation and any other legitimate expenses; and

(3) The amount per thousand cubic feet to be paid by consumers in order to raise the necessary funds to pay all cost and expenses and the compensation to be received by the gas company

—Petersburg Gas Company v. City of Petersburg et al. (Va.) 110 S. E. 533, 20 A. L. R. 542.

In Muskogee Gas & Electric Co. v. State et al., 81 Okla. 176, 186 Pac. 730, it was held:

"The fixing of rates is not a judicial function, and the right to review the conclusions of a board with legislative power such as that exercised by the Corporation Commission, is limited in determining whether the board acted within the scope of its authority, or the order is without foundation in evidence, or a constitutional right of the public utility has been infringed upon by fixing rates which are confiscatory or insufficient to pay the cost of the service and return to the utility a reasonable profit on the investment."

The Corporation Commission in fixing a rate for a public utility should always, as nearly as possible, ascertain the facts from the evidence introduced, and the findings and order of the commission should be supported by the evidence. The rate necessary to be fixed by the commission to produce a sufficient amount of revenue to pay operating expenses, interest upon the investment, and a reasonable depreciation, for amortization must be determined upon the proof of the facts that may be introduced under the above designated captions.

Our first consideration will be directed to the different contentions of the respective parties and the findings of the commission in reference to valuation.

The plaintiff alleged that the value of its property, including the distribution system and its field lines, was $488,477.19. The evidence disclosed that the plaintiff ascertained its valuation by taking the valuation of $208,000, fixed by the Corporation Commission in 1914, of which $100,000 was for field lines, to which it added the actual cost of additions as shown by the books of the company and from which amount it deducted depreciations, and to the depreciated amount

it added 20 per cent. to cover overhead and other intangibles, working capital, interest during construction, and going concern value; by this method, arriving at the net valuation of $488,477.19. The commission's method of determining the valuation is found in its order in part as follows:

"The application of the Okmulgee Gas Company filed in this cause sets forth a valuation at the time of the filing of same of $556,634.52. The commission in making and entering the order of November 4, 1921, to wit, Order No. 1949, took as a tentative basis and for the purpose of that order, a valuation of $389,113.10. The testimony adduced at the hearing before the commission as to the value of the property used and useful by the applicant company, is conflicting and very much confused, and when taken as a basis for the arrival at a permanent value for rate making purposes is very indefinite. In treating the subject in Order No. 1949, the commission adopted tentative values to meet the necessities of the occasion. It is believed, however, by the commission, that the value of any property to its owners is not greater than that which they are satisfied to realize upon. It is shown in the evidence taken at the hearing that at a meeting of the board of directors of the Okmulgee Gas Company on June 20, 1919, the following resolution was adopted:

" 'Whereas, it appears from the books of the company that the average capital investment in the company's plant and property for the year 1919 will exceed the sum of $350,-000, and

" 'Whereas, it further appears that the present franchise of the company in the city of Okmulgee will expire July 20, 1925, and the present contract for gas with the Kingwood Oil Co. will expire in less than five years from this date, and

" 'Whereas, the salvage value of the company's plant and equipment at the expiration of said contract and franchise will not exceed the sum of approximately $50,000, and it will therefore be necessary during a period of approximately five years for the stockholders of the company to receive a return on their capital investment.

" 'Be it therefore resolved that the company set up on its books for each year, beginning with the year 1919, and continuing thereafter for five years, a reserve for depreciation and obsolescence equal to 20% of the amount found by deducting from the average capital investment for each year, the sum of $50,000 salvage value aforesaid; and that liquidation dividends be declared and paid from time to time equal to the amount of such reserve.

" 'And be it further resolved, that whereas it appears that such reserve for the year 1919 will exceed the sum of $55,000 and the receipts of the company will warrant the payment of a liquidation dividend to the amount of $52,000, that such dividend be and the same is hereby declared and ordered paid.' "

The commission, in its opinion, in detail discusses the dividends paid out in pursuance of the resolution mentioned in its order, and shows that on June 20, 1919, there was a liquidating dividend of $52,000 paid to the stockholders, and that on December 31, 1920, there was an additional liquidating dividend of $75,988.64 paid out. The commission makes the following statement in its opinion with reference to ascertaining the value of the property of the plaintiff:

"For the purpose of this order it is not considered by the commission absolutely necessary to determine a~~ fixed value of the property of the gas company, for the reason that in this case the evidence shows profits of the past to have been such that no change in the rate schedule is considered necessary, consequently there is no present necessity to fix a permanent value."

The commission then sets out the book value of the property for the period from 1914 to 1921, inclusive, increased by 20 per cent., which shows net earning over and above operating expenses for the eight years of $316,463.65, and after deducting a reasonable rate of return, there is $84,941.83 left to apply upon depreciation, and the commission in its findings states "that the fair present value of the property used and useful in the business of distribution and sale of natural gas by the Okmulgee Gas Company in the city of Okmulgee is not in excess of that found by this commission in Order No. 1949, to wit, $389,113.23."

Order No. 1949 was the original order of the commission entered November 4, 1921, denying the application of the appellant for an increase in rates, and which was subsequently set aside by the commission on November 30, 1921, on its own motion after the case had been appealed to the Supreme Court, for the purpose of incorporating in the record additional testimony. On the 5th day of February, 1922, after having heard additional testimony and after the case had been remanded by this court for further hearing, the commission entered Order No. 2004, which is involved in this appeal.

This court has repeatedly announced the rule that the findings of the commission are presumed to be prima facie, just, reasonable, and correct, and must be so accepted by this court unless the court can determine from the evidence in the record that such findings are not supported by competent evidence. Muskogee Gas & Electric Co. v. State et al., supra.

It is obvious that the commission did not use a proper method in determining the value of property of appellant dedicated to public use. While there is no definite or invariable rule adhered to in determining value of public service property, and, such value must be determined from proper and relevant testimony with the exercise of reasonable discretion by public utility commissions, yet a careful consideration of the authorities discloses that the rule is uniformly adhered to that the present value of the property used and useful in serving the public must be ascertained to a reasonable and definite extent in order to fix a reasonable and adequate rate to be charged by a public utility.

One of the first cases wherein the various elements are taken into consideration in prescribing a rate is the case of Smyth v. Ames, 169 U. S. 466. In this case the representative for the railroad was contending for original cost as the proper basis for determining present value. Those representing the shippers, and the public, contended that the cost for reproducing the property was the proper basis for rate making purposes. The court in that case laid down the rule that the value of the stocks and bonds, the original cost, the cost of reproducing the property, its earning power, etc., were elements that should be taken into consideration by the court, without stating what weight or consideration should be given to any one particular element entering into the valuation. We believe it must be conceded in a small property, like the one under consideration, it seldom, if ever, has stocks or bonds upon the market, and its earning power depends entirely upon the rate authorized by the rate-regulating tribunal. Hence, it is clear that the rate-making tribunal is practically reduced to the consideration of the original cost and reproduction new, less depreciation, to determine the reasonable value of the property.

In the case of Simpson v. Sheppard, 230 U. S. 352, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, the Minnesota Rate Case, Mr. Justice Hughes, in delivering the opinion of the court, said:

"It is clear that in ascertaining the present value we are not limited to the consideration of the amount of the actual investment. If that has been reckless or improvident, losses may be sustained which the community does not underwrite. As the company may not be protected in its actual investment, if the value of its property be plainly less, so the making of a just return for the use of the property involves the recognition of its fair value if it be more than that.

"The property is held in private ownership, and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law."

In the case of Havre De Grace & Perryville Bridge Co. v. Towers (Md.) 103 Atl. 319, the Court of Appeals of Maryland had under consideration an order of the Public Service Commission of that state wherein a property had been purchased by the owners for $89,000 and a valuation for rate-making purposes of $350,000 was claimed. The court said:

"The original petitioners to the commission seem to have proceeded on the theory that as the bridge cost the incorporators but a very small sum, and as its receipts have been more than sufficient to defray the operating expenses and repay the original outlay, that because it was a public highway they were entitled to have the use of it for merely a nominal sum. The statement of so extreme a proposition is a sufficient refutation, and was so regarded by the commission."

In the case of Wilcox v. Consolidated Gas Co., 212 U. S. 19, 52, the Supreme Court said:

"And we concur with the court below in holding that the value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property which legally enters into the consideration of the question of rates has increased in value since it was acquired, the company is entitled to the benefit of such increase."

In the case of Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 59 L. Ed. 1244, the court, on page 1252, said:

"It is not a question of what was actually expended therefor in the plant in question, but what would it cost to reproduce a similar plant at the present time. It is through this method we reach the present value of this plant now, and then when it is properly depreciated, according to the condition, life, and age of its various parts, we reach the present value of the plant in its present condition. It is not a perfect method, but it is the best method therefor, and results as nearly as possible in giving the present value of the plant. No other method known has proved so satisfactory."

In the case of People ex rel. Kings County Lighting Co. v. Wilcox et al. (N. Y.) 104 N. E. 911, the court said:

"The cost of reproduction less accrued depreciation rule seems to be the one generally employed in rate cases."

In the case of Murray v. Public Utilities Commission (Idaho) 150 Pac. 47, the court said:

"This court is of the opinion that the rule of cost of reproduction less depreciation,

adopted by the commission, is the current general rule or principle to be applied in this class of cases."

To the same effect: Denver v. Denver Union Water Co., 246 U. S. 178; San Diego Land & Town Co. v. Jasper, 189 U. S. 438 442; San Diego Land & Town Co. v. National City, 174 U. S. 739; Consolidated Gas Co. v. N. Y., 157 Fed. 849; Shepard v. Northern Pacific Ry. Co., 184 Fed. 765; National Water Works Co. v. Kansas City, 62 Fed. 83; Ames v. Union Pacific, 64 Fed. 165, 177, 186, 187; Metropolitan Trust Co. of City of New York v. Houston & T. C. R. Co. et la., 90 Fed. 683, 686, 687; Gloucester Water Supply Co. v. City of Gloucester (Mass.) 60 N. E. 977, 981; Kennebec Water District v. City of Waterville et al. (Me.) 54 Atl. 6, 18; Consolidated Gas Co. v. City of New York et al., 157 Fed. 849, 854-5; City of Knoxville v. Knoxville Water Co., 212 U. S. 1, 9-11, 15; Atchison, T. & S. F. Ry. Co. v. Sullivan County Treasurer et al., 173 Fed. 456, 464-5; Missouri, Kansas & Texas Ry. Co. v. Love et al., 177 Fed. 493, 496; Louisville & N. R. Co. v. Railroad Commission of Alabama et al., 197 Fed. 954.

As a general rule, to determine the value of a small public utility property, what it would cost to reproduce the property less accrued depreciation is the safest and most certain method of obtaining present fair value upon which such utility is entitled to a return.

In the cases of the City of Minneapolis v. Rand et al., Rand et al. v. City of Minneapolis, Minneapolis Gaslight Co. v. Same, 285 Fed. 818, the Circuit Court of Appeals, Eighth Circuit, said:

"In determining what rate will enable a gas company or other public utility to earn a fair return, its property used is to be taken at its fair value at the time the rate is in force, and whether it earned more or less than a fair return in the past does not affect the question.

"Under the rule of the Supreme Court that the present fair value of the property of a gas company used in the public service is to be taken as the basis for fixing reasonable rates, the company is entitled to such value, even though it has been increased as the result of enhanced war prices.

"Neither the original cost nor the present cost of production is always a fair measure of the present value of the physical property of a gas comany for rate-making purposes; but where the plant has been in use for a number of years, an allowance must be made from either cost for depreciation."

The, authorities are not in harmony as to the effect of abnormal prices caused by reason of war or depression in ascertaining the present value of public utility property by following the rule of cost of production less observed depreciation. A careful examination of the authorities convinces us that the better reasoned cases and the weight of the authorities are to the effect that in determining valuation for rate-making purposes the rate-making tribunals with respect to plants constructed at pre-war prices will give due consideration to the post-war, abnormally high prices of labor and materials, but that such prices should not be the sole criterion or controlling element in fixing valuations for rate-making purposes. Petersburg Gas Co. v. City of Petersburg et al., supra, and authorities cited in note at page 556.

It is obvious that in determining the cost of reproduction of property, in order to ascertain its present fair value or the amount for rate-making purposes, the exclusive consideration of abnormal prices caused by war conditions would be manifestly unjust to the public, as would the exclusive use of prices during a period of financial depression, to the public utility company. The term "ascertainment of value by the cost of reproducing" must not be used in a strict sense, but in order to the proper administration of justice it will be held to mean the cost of reproducing the property under normal or average conditions. Proper considerations being given to the conditions under which the property had been actually constructed and the prices paid for labor and material, it is plain that peak prices would be palpably unjust for the prices of ascertaining the reproduction fair value, as any intended purchaser of such property would always, for the purpose of making a permanent investment, consider the probabilities of the reduction in the price of labor and materials and the gradual but certain adjustment of the country to normal conditions. Therefore, it is apparent that the equitable rule to be followed in the ascertainment of the present fair value of public utility property by resorting to the method of "cost of reproduction less accrued depreciation" is to give due consideration to the history and circumstances under which the utility property was created, and the prevailing prices of material and labor at the time of the investigation, and determine the fair average price of materials and labor necessary for the reproduction of the property. Pursuant to this method and the application of sound judgment and common sense, impartial tribunals will discharge the duty in the ascertainment of such values so

as to insure the public utility a fair return upon the present value of its property and the patrons a reasonable rate for the services rendered. People ex rel. Adirondack Power & Light Corporation v. Public Service Commission et al., 200 App. Div. 268, 193 N. Y. Supp. 186; Bell Teleph. Co. (1920, Ark.) P. U. R. 1921B, 516; Petersburg Gas Co. v. City of Petersburg, supra. Of course, if no abnormal conditions exist, the rule of "cost of reproduction less accrued depreciation" may unqualifiedly be followed.

The authorities all seem to agree that necessary additions or improvements should be valued at the cost price without deduction for probable reduced future prices.

From an examination of the authorities we are unable to find that any definite rule has been announced defining just what items are to be considered in fixing the amount to be allowed for going concern value, and where the rule is adhered to in ascertaining present value of "cost of reproduction less depreciation," it is plain that the considerations are to a great extent narrowed in making any allowance for going concern value. This, for the reason that the cost of reproduction less accrued depreciation necessarily means the present value of the property in the condition in which it stands as a reproduced plant, and such necessarily must include all of the incidental expenses in establishing the plant as a going, operating property. So the courts and commissions in allowing an arbitrary amount for a going concern value must have necessarily only included such contingencies and omissions as experienced engineers would leave out of their estimates and calculations in appraising the physical property, such as sufficient amount to cover working capital. Working capital means a sufficient amount of money to pay employes and pay for the necessary equipment for repairs, and is based upon from four to six weeks' actual operating expenses—that this amount of time would usually expire before collections could be made from consumers—legal expenses in organizing, insurance, and other contingencies not included in the valuation of the physical property.

It appears that the Corporation Commission usually makes an allowance of 20 per cent. to cover the items of going concern value, working capital, and contingencies, and from an examination of the authorities we are convinced that the allowance is a reasonable one. The error of the commission in determining the appellant's application for increased rates in this case that is

apparent was in considering what the commission believed to be excessive past earnings made by the appellant in the years 1919 and 1920.

In the case of Newton v. Consolidated Gas Co. (U. S.) 42 Sup. Ct. Rep. 264, 66 L. Ed. 538, the court said:

"Mere past success could not support a demand that it continue to operate indefinitely at a loss."

And, in the case of Garden City v. Garden City Co., 236 Fed. 693, 150 C. C. A. 25, the court said:

"It is in effect claimed that the appellee must have charged excessive rates for the early years of its existence, when no charges were fixed by law, and invested these unjust exactions in the plant, and is now seeking to receive a return upon those illegal exactions. No judicial authorities are cited on this point. In the first place, there is no evidence that the company ever charged excessive rates until about the commencement of the controversy out of which this litigation arose; but, if it did so, the various parties from whom they were extorted had a cause of action against the company to recover the excessive rates until the statute of limitations had run. Presumptively they were not the identical persons who are now the consumers from the appellee. It is the practice of courts to try cases one at a time, and if the appellee has put money into the development of the plant, the court in this case could not stop to inquire just how it acquired the title to the money. Such a system would involve an investigation into the wholly collateral matter of the entire past life of litigants and the manner in which they acquired the money invested in a private enterprise."

See City of Minneapolis v. Rand, supra.

It is plain, under the authorities herein cited, that the method adopted by the commission to ascertain the value of the property in this case was not the proper method. The decision of the commission in this case is based principally upon its consideration of a resolution adopted by the board of directors of the appellant in June of 1919, estimating the valuation of its property at $350,000, with a view of liquidating the same within a period of five years. It may be at that time the stockholders of the property, by reason of the limited time the company had a franchise to operate under, considered its property worth no more than that indicated in the resolution for the purpose of liquidation; but the test to be applied to property for the purpose of making a rate is its present cash value, to be ascertained by reproduction less accrued depreciation.

It appears from the record in this case that the only competent evidence before the commission as to the value of the property of the appellant was submitted by the appellant. The valuation, as established by the appellant, was based upon a valuation made by the commission during 1914, or before the war, and the remainder was the result of building additions made during the high prices and bought at a time when the prices were higher than in 1921, the date of this inquiry. It may be fair to assume that the reproduction now less depreciation would have reduced the expenditures during the high prices and raised the amount during low prices until a substantial valuation might be considered. While this may not have been entirely accurate, inasmuch as the $488,477.19 does not appear to be unreasonable, and until further inquiry may be had such valuation will be adopted for the purpose of this case.

The commission criticised the operating expenses without making any specific finding of what was proper and what was not proper. The commission says:

It's general manager is also the president of an oil company, and testified that he devotes at least some portion of his time to matters not in connection with the duties of the general manager. He draws a salary of $5,000 per year, which it appears is out of proportion to salaries paid by similar companies for like services. The general manager of a gas plant the size of the Okmulgee Gas Company should have no other business than to look after the plant. It is the duty of the commission to determine from the evidence whether such general manager draws the salary because he may own controlling interest in the plant, or whether in fact he is a capable, competent gas plant operator. The public that pay these salaries are entitled to the service of a man, capable and competent of keeping the plant in good condition at the lowest expense. The general manager of a gas plant is not an office position. If he performs his duty well, he should be out when all repairs are made, and inspecting the plant, reducing leakage, and looking after complaints of consumers and customers at all times. In cases where the evidence shows that any employe, or supposed employe, is drawing a salary, the commission should determine whether or not this salary is a proper allowance from the standpoint of the competency of the man and the actual time devoted to the services. We mean by this that the commission should disallow all salaries to employes who may draw the same and perform the duties of the position in name only.

The commission further says:

"It appears from reports on file with this commission that for the years 1919 and 1920 there was charged to operating expense some $20,000 for automobile expenses and charged to capital investment. Included in this expense is the sum of $3,000 for an automobile for the personal use of the general manager of the company."

The public should not be required to pay for expenditures of this magnitude in a plant the size of the Okmulgee Gas Company. Where any expense is above the average for similar expenditures in other plants, the commission should make a careful investigation, which, in this case, it would probably find that it was not the duty of the public to provide the manager with a $3,000 automobile for his personal use; that one light truck, such as a Ford truck, and two other light cars, such as a Ford or Dodge, would be all the automobiles necessary for the proper operation of a plant the size of the Okmulgee Gas Company.

The commission further found that:

"During the year 1920 there was charged to maintenance approximately $33,000, but neither the general manager nor auditor had more than an indefinite idea of what it was for."

It is clear, however, that at least $20,000 of it was for changing the location of some pipe, and rearranging other pipe on account of street paving. The operating expenses of a company for past years should only be considered by the commission for the purpose of determining what the operating expenses may be from the time the order is made in the future, and if an extraordinary operating expense has developed in this case of $20,000, incurred because of paving streets, etc., this is a past expenditure, and should be charged to the accrued depreciation fund, or paid out of the $84,941.82 mentioned by the commission, and the expense for the ensuing year should be determined or estimated by the commission less any abnormal expense or conditions that prevail during the preceding year.

The commission further states in its findings of fact as to operating expenses:

That the auditor, whose salary was $265 per month until recently, when it was reduced, is also secretary of the same oil company of which the general manager is president.

The auditor of a gas company the size of the Okmulgee Gas Company should draw such salary as the evidence may show an ordinary bookkeeper should receive for such

services. The keeping of the books of a gas company the size of the Okmulgee Gas Company is a very common and ordinary bookkeeping position, and where employes of a gas company are also employes of an oil company, the expenditures in every instance should be carefully investigated by the commission and such allowance for the services made as the evidence may show is proper. In each and every instance the commission should find specifically what it allows for each contested item.

The expenditures of the various companies in the state from year to year for maintenance for the same size and kind of plants should not materially vary, and when during the rate investigation it appears from the evidence that certain expenditures are abnormally high, the commission should make a thorough investigation and make findings of fact in the record saying specifically how much is allowed and how much is disallowed. In the final summing up the order should find that the value of the property was a certain amount; that the operating expenses, as determined by the commission, were a certain amount; that the rate of depreciation and return allowed by the commission is a certain amount; then make an estimate of what rate should be charged, based on the previous year's consumption of the commodity.

In fixing the rate of depreciation the commission should take into consideration the present life of the plant, if it be a small natural gas plant, and such depreciation allowed as would return to the investors their money over the probable period of the life of the plant, considering the average number of years the plant had been in service and the approximate life of the same, which in this case would probably be 20 years. This depreciation allowed is for amortization, and is not used for the purpose of repairing the plant. The repairing of the plant and keeping the same in its present good condition is a proper charge for operating expense from year to year. The commission allowed in this case five per cent. depreciation and eight per cent. interest on the return, which the court finds to be reasonable.

The rates fixed by the commission are inadequate to pay a return upon the investment and depreciation. This is partly due to the fact that there was no provision made whereby gas could be sold for industrial purposes, and in all cases where the consumption of gas is reduced to domestic cooking and heating the quantity used throughout the year is such that it requires a much higher rate than where rates may be adjusted so that industries may use the gas.

In the determining of the value of the property the commission confined its value to the distributing plant, whereas the plaintiff in error insists that it furnishes practically all of the pipe lines to gather the gas at the well and deliver the same to the compressor of the Kingwood Oil Company, and that it furnishes practically all of the pipe line to pipe the gas from the wells to the city and then pays the Kingwood Oil Company 22½ cents per thousand cubic feet, which price it claims the commission approved.

The commission should determine the value of the gas at the well or at the city gates. If the plaintiff in error purchased the gas at the well, it should be allowed a reasonable return upon the investment in pipe line necessary to deliver the same to the city of Okmulgee. If the Kingwood Oil Company strips the gas before it is delivered to the distributing company, the commission should determine what a reasonable and fair price of the gas thus stripped and delivered to the city gates should be allowed the Kingwood Oil Company, and the Kingwood Oil Company should pay the interest upon all investments necessary to put the gas to the city limits. It appears that the average price of natural gas at the well in Oklahoma is about 10 cents. However, a fair price of gas in each particular field or locality must be determined by the evidence in each particular locality.

This case must be remanded for a further and complete investigation by the commission, and the Kingwood Oil Company should be made a party to the proceeding, and the commission should determine the price to be paid to the Kingwood Oil Company for gas at the city gate or at the well. The price at the well would be for natural gas, which means gas as it comes from the well. If the price is fixed at the city gates for gas, the commission should take into consideration the making of proper allowance to the Kingwood Oil Company for the value of the products taken from the natural gas as a part of the income from its operations and the sale of stripped gas to the Okmulgee Gas Company at the city limits. We are clear the commission has jurisdiction of the Kingwood Oil Company. The evidence shows it has dedicated its well to the public use and is selling gas for public use. Chapter 93, sec. 1, Session Laws 1913, provides:

"The term 'public utility,' as used in this act, shall be taken to mean and include every corporation, association, company, individuals, their trustees, lessees, or receivers, successors or assigns, except cities, towns, or other bodies politic, that now or hereafter may own, operate, or manage any plant or equipment, or any part thereof, directly or indirectly, for public use, or may supply any commodity to be furnished to the public.

"(a) For the conveyance of gas by pipe line.

"(b) For the production, transmission, delivery of furnishing electric current for with gas.

"(c) For the production, transmission, delivery or furnishing electirc current for light, heat or power.

"(d) For the transportation, delivery, or furnishing of water for domestic purposes or for power.

"The term 'Commission' shall be taken to mean Corporation Commission of Oklahoma."

The rule is well established that when private property is devoted to public use, it is subject to public regulation. Munn et al. v. Illinois, 94 U. S. 113, 24 L. Ed. 77.

It appears from the evidence in the record that during the year ending November 31, 1921, the total sales of gas for all purposes by the gas company were 956,025 M cubic feet, of which 268,302 M cubic feet were sold for industrial purposes. That the following rates which the gas company made application to have increased, are inadequate for the gas company to realize a fair return on the value of its property as adopted herein:

The first 100,000 cubic feet per month, 47 cents per M.

The next 400,000 cubic feet per month, 37 cents per M.

All over 500,000 cubic feet per month, 27 cents per M.

The question now to determine is the rate that the commission should have made. The operating expenses will be allowed and considered as introduced by the plaintiff with the exception of the item of loss of gas. The commission allowed 10% for loss of gas, which was charged to operating expenses. The Kansas commission has adopted a rule of allowing 200,000 cubic feet per mile of three-inch equivalent. In a recent case the Kansas Public Utility Commission, in the Matter of the Application of the American Gas Company to Increase

Rates, Docket No. 4729, applied the above rule and allowed about 9 per cent. for leakage. Excessive leakage in a gas distributing plant is due to inadequate maintenance or defective meters. Where a plant is properly maintained, leakage should never run as high as 23.3 per cent., as claimed by the gas company in the instant case, and may be reduced below 10 per cent. Very little is to be accomplished by the state in passing conservation laws and keeping inspectors throughout the state to conserve gas at the wells if approximately 25 per cent. of the gas is to be wasted through the distributing plants. The leakage in the plaintiff's gas plant for the year 1921 was 23.3 per cent. This was excessive, and strongly tends to show inefficiency in the management of the plant. The amount of leakage should be determined by the commission in each case according as the facts are established by proper testimony, keeping in mind the fact that, where the cost of maintaining the plant is as great or greater than the gas conserve, the commission may be more liberal in the mount allowed for leakage.

By using 10 per cent. leakage as allowed by the commission and the valuation claimed by the gas company, the following is a statement of the result obtained: The rate base value claimed by the plaintiff in error as of June 30, 1921, is $488,477.19. The return of 8 per cent. allowed by the Corporation Commission for interest and dividends and 5 per cent. additional for depreciation and amortization on the value as alleged by the plaintiff amounts to $63,502.04. The operating expenses, including cost of plaintiff's gas and the taxes for the same year, were $328,411.53, making a total necessary for the plaintiff to earn in order to meet its operating costs, taxes, allow a fair return for interest and dividends and a reasonable amount for depreciation and amortization, of $391,913.57. During the year ending November 30, 1921, the plaintiff's gas sales amounted to 956,025 cubic feet. The plaintiff's rate, as authorized by the commission, was 47 cents per M cubic feet for the first 100,000 feet, 37 cents for the next 400,000 cubic feet, and for all over 500,000 cubic feet 27 cents, with a discount of 2 cents per M cubic feet for prompt payment of bills. The net rates were, therefore, 45, 35, and 25 cents, respectively, as the additional 2 cents operated only as a penalty on the very small number of bills which were not paid promptly. Of the total of 956,025 M cubic feet of gas sold during the year ending November 30, 1921, 219,233 M cubic feet were sold at the

25 cents step in the rate, and the remainder, 736,792 M cubic feet, at the other two steps in the rate; but no division was made as to the number of feet sold at 45 cents and the number sold at 35 cents. Figuring the total sales at the two steps in the rate at the higher step of 45 cents, amounts to $331,556.40, and the 219.233 M cubic feet sold at 25 cents amounts to $54,808.25, making a total of $386,364.65. Deducting the amount derived from the sale of gas from the total amount necessary for the plaintiff to earn, as above set out, would result in a deficit of $5,548.92. An increase of 2 cents per M cubic feet on the quantity of gas sold at the first two steps of the rate would make an additional revenue of $14,735.84, which would change the deficit to a surplus of $9,-186.92, which would offset the gas sold at the second step in the rate, that is, 35 cents, which was computed at 45 cents in the above calculations, and also leaves an additional amount for leakage over the amount allowed by the commission.

In view of this situation, the following schedule of rates is hereby established as follows:

(a) The first 100,000 cubic feet per month, 50 cents per M.

(b) The next 400,000 cubic feet per month, 40 cents per M.

(c) All over 500,000 cubic feet per month, 28 cents per M.

These rates should remain in force and effect as a permanent rate until such time as the commission may make a full and complete investigation as herein required, at which time the commission should promulgate such rates as may be fair and reasonable from the evidence introduced at such investigation. The plaintiff may cooperate with the delivering or producing company in making such industrial rates as may be necessary to meet fuel competition.

The cause is remanded to the Corporation Commission with directions to proceed in accordance with the views herein expressed.

JOHNSON, C. J., and KANE, NICHOLSON, COCHRAN, BRANSON, and MASON, JJ., concur.