NORTHWESTERN PUBLIC SERVICE
COMPANY, a corporation, Plaintiff
and Appellant,

v.

CITIES OF CHAMBERLAIN, HURON,
MITCHELL, REDFIELD, WEBSTER,
AND YANKTON, South Dakota, and
South Dakota Electric Consumers, De-
fendants and Respondents.

No. 11909.

Supreme Court of South Dakota.

May 3, 1978.

James E. Doyle, of Doyle & Bierle, Yankton, John B. Wehde, of Benson, Beach, Wehde & Martin, Huron, Everett E. Hoyt, Merle D. Lewis, Huron, for plaintiff and appellant.

James T. Goetz, Robert W. Hirsch, of Goetz, Hirsch & Haar, Yankton, Reuben Goldberg, Arnold Fieldman, of Goldberg, Fieldman & Hjelmfelt, Washington, D. C., for defendants and respondents.

WOLLMAN, Justice.

Appellant, Northwestern Public Service Company, (the company) is an investor-owned electric and gas public utility company that in 1973 provided electric service to some 108 communities and 1,700 farms in eastern South Dakota. Although prior to July 1, 1975, authority to regulate such utilities was vested in municipalities by SDCL 9–35–1, until autumn of 1973 none of the communities served by the company had ever exercised such authority.* In June of 1973, the company filed a rate increase of some 15.4%. This increase went into effect on August 13, 1973, upon the lifting of the President's wage and price freeze.

In the fall of 1973, the cities of Chamberlain, Huron, Mitchell, Redfield, Webster, and Yankton (cities) formed a consortium pursuant to SDCL 1–24 known as the South Dakota Electric Consumers (SDEC) for the purpose of jointly investigating the company's rate filing. In October and November of 1973, each of the cities passed a "vehicle" ordinance specifying the type of information the company would be required to submit to the cities at a subsequent rate hearing. See *State ex rel. South Dakota Electric Consumers v. Northwestern Public Service Co.*, S.D., 232 N.W.2d 854. A rate hearing was conducted by the cities on March 18–20, 1974, and in May, 1974, each of the cities passed an identical ordinance incorporating their findings and conclusions on the evidence introduced by the company and SDEC at the rate hearing. These ordinances declared the company's 15.4% rate increase to be unreasonable and fixed rates that would provide the company a revenue increase of approximately 8.5%.

The company commenced this action in circuit court for a declaration that the rates established by the cities' ordinances were unreasonable and confiscatory and that the cities had acted arbitrarily and unreasonably and thereby deprived it of its property without due process of law, all in contravention of the United States and South Dakota Constitutions. The company moved the court to admit evidence of data of its actual costs experienced subsequent to the rate hearing to show the accuracy of its estimates and, the inaccuracy of SDEC's estimates presented at the rate hearing. Following a hearing on the motion, the court ruled that its review of the rate ordinances would be limited to the record made before the cities. From a judgment based on findings of fact and conclusions of law affirming the cities' actions and ordinances in all respects, the company has appealed. We reverse and remand.

The cities employed the cost of service method of testing the reasonableness of the company's rate increase. Under this orthodox method, the rate analysis is broken

---

* Ch. 283, Laws of 1975, terminated the authority of municipalities to regulate utility rates. Section 60 of Ch. 283 continued such authority with respect to any rate increase applications pending as of March 21, 1975.

down into four subsidiary determinations: (1) what gross revenues would the rates produce; (2) what operating expenses would the utility experience under the rates; (3) what is the rate base, that is, the dollar amount of the property used and useful in providing the service for which the rates are to be charged; and (4) what rate of return should be deemed reasonable. The starting point of the inquiry was the company's books and a test year ending June 30, 1973. Since the company is a combination gas and electric utility, the initial step in obtaining meaningful figures was the separation of all accounts by department. From the test year data the actual or book values for the four items could then be determined. To these figures, pro forma adjustments to reflect known and measurable changes which would occur within a reasonable time were made. The various sets of figures were then allocated between the cities and others receiving service. There was little, if any, dispute between the parties concerning the accuracy of the book values presented by the company. Rather, the differences between the parties and the issues presented in this appeal arise primarily from different theories of how certain items and adjustments should have been treated to properly reflect an accurate model of anticipated performance and from conflicting judgments of what was reasonable.

The cities' ordinances allowed the company a 12.1% rate of return on its common stock equity and an overall rate of return of 8.79% on its electric department rate base. The cities found that the company had overstated its operation and maintenance expenses for the total electric department by $1,260,180, of which $863,709 was allocable to the cities. The ordinances determined that the company was reasonably entitled to approximately $666,822 less in annual revenues from the cities than the company would have received under its August 13, 1973, rate increase.

The company contends that the cities' rate ordinances were arbitrary, unreasonable, and confiscatory for these reasons: (1) they understated the company's rate base

(a) by improperly determining the company's working capital requirements and (b) by improperly deducting the unamortized three percent investment tax credit from rate base; (2) they understated the company's operating expenses (a) by improperly calculating the anticipated cost of purchased power, (b) by failing to include anticipated increased payroll costs, (c) by including for income tax purposes a deduction for interest cost associated with construction work in progress, and (d) by amortizing the expenses of the rate hearing over a three year period; and (3) they fixed an inadequate rate of return.

## Scope of Review

Before addressing these issues, we must set forth the principles governing our review of the ordinances in question.

■ This court has consistently recognized that ratemaking is a legislative process, whether performed directly by the legislature or by an agency of its creation. "The legislative discretion implied in the rate making power extends to the process by which a legislative determination is made and within the broad field where that discretion is operative legislative determinations are conclusive. (citations omitted). So long as a legislative agency pursues its authority and does not transgress constitutional limitations, the courts have no power to interfere with its determinations." *Application of Northwestern Bell Telephone Co.,* 78 S.D. 15, 23, 98 N.W.2d 170, 174.

The company argues that in determining whether a utility's property has been unconstitutionally taken by the setting of an inadequate rate, a reviewing court must make an independent review of the facts and the law. The cities, on the other hand, contend that our review of the rate ordinances is governed by the usual substantial evidence rule and that we are not to substitute our judgment for that of the cities.

It is true that in *Application of Northwestern Bell Telephone Co.,* 69 S.D. 36, 6 N.W.2d 165, this court quoted Chief Justice

Hughes' opinion in *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033, for the proposition that in ratemaking cases courts are to exercise an independent review upon the facts and the law. 69 S.D. at 45, 6 N.W.2d at 170. Notwithstanding this reference to the St. Joseph Stock Yards case, the court, quoting from *Application of Dakota Transportation, Inc.*, 67 S.D. 221, 231, 291 N.W. 589, 594, stated:

"[T]his Court holds that 'in a proceeding to review an order of the Commission, administrative or legislative in nature, judicial action cannot supplant the discretionary authority of that body. The review by the court exercising judicial functions only cannot extend beyond the questions whether the Commission has acted within its constitutional or statutory powers and whether its order or determination is supported by substantial evidence and is reasonable and not arbitrary.'" 69 S.D. at 45, 6 N.W.2d at 170.

It is true that in reviewing a decision of the Public Utilities Commission this court stated that:

"What was said in *Application of Dakota Transportation, Inc., of Sioux Falls*, 67 S.D. 221, 291 N.W. 589, and cases cited with respect to the scope of judicial review of orders and determinations of the Commission has no application where constitutional rights respecting rates are involved. The requirements of due process are ordinarily met by acting upon evidence and not arbitrarily. Where confiscation is claimed, due process requires judicial determination as to both law and facts." *In re Northwestern Bell Telephone Co.*, 73 S.D. 370, 377, 43 N.W.2d 553, 557.

Some nine years later, however, this court cited both of the *Northwestern Bell* cases for the proposition that,

"The powers of the reviewing courts are purely judicial and the review does not extend beyond the question whether the Commission has acted within its constitutional or statutory powers and whether its order or determination is supported by

substantial evidence and is reasonable and not arbitrary." Application of Northwestern Bell Telephone Co., 78 S.D. 15, 24, 98 N.W.2d 170, 175.

The court went on to state that the Public Utilities Commission need not follow any single formula in arriving at the rates fixed so long as the method followed and the order entered when applied to the facts and viewed as a whole do not produce an unjust or arbitrary result. Indeed, the court upheld the disallowance by the Commission of certain claimed expenses with the statement that,

"The Commission was not required to give conclusive weight to the showing presented by the Company. The disallowance was based on substantial evidence and we cannot disturb it." 78 S.D. at 31, 98 N.W.2d at 179.

We think that a fair reading of this last cited case leads to the conclusion that the court in fact examined the record to determine whether the action of the Public Utilities Commission was arbitrary, capricious or unreasonable and whether the Commission's findings were supported by substantial evidence. The "independent review of the facts and the law" standard of review was in effect subsumed within the overall function of the reviewing court to serve as an independent check upon the arbitrary, capricious and unreasonable exercise of the legislative authority possessed by a ratemaking body. If the fixing of rates is a legislative and not a judicial function, as was recognized by this court in all three of the Bell Telephone Co. cases cited above, then the characterization of the scope of review as "independent" adds nothing to the reviewing court's proper function, for under any scope of review the determination by the ratemaking body must be upheld unless unconstitutional confiscation is shown to be the result of the rates determined by that body. In short, although the phrase "independent judicial review upon the facts and the law" has been articulated as a type of judicial shield on behalf of utilities against the depredations of ratemaking bodies, in fact this court has applied

a far more restricted, conventional scope of review in rate cases. This is not to say that other courts do not still utilize the concept, in statement at least. See, e. g., *New England Telephone & Tel. Co. v. Dept. of Public Utilities,* Mass., 354 N.E.2d 860.

■ Although we have no statutory mandate that the findings by the cities concerning the facts shall be conclusive if supported by substantial evidence, we agree with the company that what the United States Supreme Court said with respect to judicial review of orders of the Federal Power Commission issued pursuant to the Federal Natural Gas Act is relevant to the proper scope of review in the instant case:

"It follows that the responsibilities of a reviewing court are essentially three. First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors." *Permian Basin Area Rate Cases,* 390 U.S. 747, 791, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312, 350.

■ In determining whether a rate is confiscatory, we start with the proposition set forth in *Application of Northwestern Bell Telephone Co.,* 78 S.D. 15, 32, 98 N.W.2d 170, 179:

"A public utility admittedly is entitled to charge such rates as will permit it to earn a reasonable rate of return on the value of the property devoted to public service. *Application of Northwestern Bell Tel. Co.,* 69 S.D. 36, 6 N.W.2d 165; *In re Northwestern Bell Telephone Co.,* 73 S.D. 370, 43 N.W.2d 553. . . . "

■ The return on a utility's investment in property employed in providing service to the public should be

"[r]easonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally." *Bluefield Waterworks & Improvement Co. v. Public Service Com'n,* 262 U.S. 679, 693, 43 S.Ct. 675, 679, 67 L.Ed. 1176, 1183.

In discussing the reasonableness of the rate of return allowed under the Federal Natural Gas Act, the United States Supreme Court stated:

"The rate-making process under the Act, i. e., the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests. Thus we stated in the *Natural Gas Pipeline Co.* case that 'regulation does not insure that the business shall produce net revenues.' 315 U.S. 575, at page 590, 62 S.Ct., 736, at page 745, 86 L.Ed. 1037. But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. *Chicago & Grand Trunk R. Co. v. Wellman,* 143 U.S. 339, 345, 346, 12 S.Ct. 400, 402, 36 L.Ed. 176. By that

standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. . . . " *Federal Power Com'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333, 345.

This latter test was summarized in the *Permian Basin Area Rate Cases,* supra, as involving a determination whether the order fixing the rate

"[m]ay reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable." 390 U.S. at 792, 88 S.Ct. at 1373, 20 L.Ed.2d at 350.

With the foregoing principles in mind, we examine the company's contention that the end result of the rates fixed by the cities is that the revenues produced by the rates are so inadequate that they result in the confiscation of the company's property.

In order to arrive at a figure that will provide a reasonable rate of return on a utility's investment, the ratemaking body must determine the proper rate base, that is, the value of the property owned by the utility which is used and useful in providing service to the public. This is the figure upon which the investors in a utility are entitled to earn a return.

In arriving at the rate of return, the ratemaking body must determine the future revenue requirements of the utility. This is done by determining the revenues, expenses and investments during a selected period of time, usually referred to as a "test year." Adjustments are made for changes that will occur in the utility's revenues and expenses within a reasonable time following the close of the test year.

■ These basic principles involved in ratemaking cases were concisely set forth by the Rhode Island Supreme Court in *Rhode Island Consumers' Council v. Smith*, 111 R.I. 271, 302 A.2d 757, and were later summarized by that court as follows:

"[I]n any public utility rate case, there are three general determinations to be made. The first is the selection of an appropriate test period during which the utility's revenues, expenses, rate base and rate of return may be measured. The test period is usually a 12-month period. Second, there must be established the utility's rate base, which is its total investment in, or fair value of, the used and useful property necessarily devoted to the rendering of the regulated service. Once the rate base has been computed, with proper adjustments being made for the utility's operating expenses and revenues, all that remains is the last element, the setting of an allowable rate of return, that is, the percentage by which a utility's rate base is multiplied in order to determine the revenue needed to pay expenses and to acquire investment capital." *Rhode Island Consumers' Council v. Smith*, 113 R.I. 384, 387, 322 A.2d 17, 19.

See also *L. S. Ayres & Co. v. Indianapolis Power & Light Co.*, Ind.App., 351 N.E.2d 814; *Davenport Water Co. v. Iowa State Commerce Com'n*, Iowa, 190 N.W.2d 583; *Northwestern Bell Telephone Co. v. State*, Minn., 253 N.W.2d 815; *Application of Northwestern Bell Telephone Co.*, 78 S.D. 15, 98 N.W.2d 170. See generally, 1 A. Priest, *Principles of Public Utility Regulation* 43–45 (1969).

We turn, then, to the specific areas in which the cities allegedly erred in determining the rates in question.

### Working Capital and Tax Accruals

■ The company contends that the cities erred in the treatment of the company's tax accruals and working capital needs. Working capital has been defined as the sum which a utility needs to supply from its own funds in order to meet its current obligations as they arise. The need for working capital arises from the time lag between the date a utility pays its expenses

and the date it recovers payments for services rendered to its customers. *Alabama-Tennessee Natural Gas Co. v. Federal Power Com'n*, 3 Cir., 203 F.2d 494; *City of Pittsburgh v. Pennsylvania Public Utility Com'n*, 370 Pa. 305, 88 A.2d 59; *Rhode Island Consumers' Council v. Smith*, 111 R.I. 271, 302 A.2d 757. As the Iowa Supreme Court stated,

> "For utility rate purposes 'working capital' is commonly defined as the amount of capital *investors* are required to put into a business, over and above investment in plant and intangibles, so as to cover any gap between cash expenditures in production and delivery of the services and collections of revenues from service sales."
> *Davenport Water Co. v. Iowa State Commerce Com'n*, Iowa, 190 N.W.2d 583, 607.

The cities made an allowance of $1,693,261 for working capital requirements, consisting of $621,357 for cash working capital, $870,914 for materials and supplies, and $200,990 for fuel stock allowances. The cities determined that accruals for taxes collected from ratepayers were available in the amount of $1,911,707 and deducted that amount from the rate base. The company contends that it was error for the cities to do so because the resulting negative cash working capital allowance understated the rate base and reduced the revenue requirements of the company.

█ It has been held proper for a ratemaking body to offset tax accruals furnished by ratepayers against the working capital requirements of a utility on the theory that investors are not entitled to earn a return on funds that have been supplied by the ratepayers rather than by the investors. In upholding such an offset, the Iowa Supreme Court held in the *Davenport Water Co.* case, supra:

> "Had Commission held other than it did, Utility's customers would be unreasonably required to pay a return on funds already supplied by them in the form of prepaid taxes." 190 N.W.2d at 607.

See also *Pacific Telephone & Tel. Co. v. Public Utilities Com'n*, 62 Cal.2d 634, 44 Cal.Rptr. 1, 401 P.2d 353; *City of Cincinnati*

*v. Public Utilities Com'n*, 161 Ohio St. 395, 119 N.E.2d 619; *Northwestern Bell Telephone Co. v. State*, 299 Minn. 1, 216 N.W.2d 841.

In determining the amount of tax accruals available to offset working capital requirements, the cities took the average of the thirteen monthly closing balances over the period from June 1972 through June 1973 for each appropriate category of accrued ad valorem, unemployment and social security, city and state use, and federal income taxes. These amounts were allocated to the electric department using factors appropriate for each of the various categories, and the allocated amounts were then added together. The same method was applied to obtain the average amount of tax collections payable, and the sum of the two, or $1,911,707, was deducted from the rate base.

█ The cities determined the company's working capital by adding an amount for cash working capital to the company's figures for materials and supplies and fuel stock. In estimating the company's cash working capital needs, the cities used a standard rule of thumb that assumes a forty-five day lag between the date of providing service and the date of receipt of payment therefore. This so-called "⅛" rule has been frequently applied as a reasonable method of estimating cash working capital needs. See, e. g., *Intermountain Gas Co. v. Idaho Public Utilities Com'n*, 97 Idaho 113, 540 P.2d 775; *Boise Water Corp. v. Idaho Public Utilities Com'n*, 97 Idaho 832, 555 P.2d 163; Public Service Co. of New Mexico, 7 PUR 4th 166 (N.M.1974); Florida Power & Light Co., 9 PUR 4th 146 (Fla. 1975). The determination of a cash working capital allowance is a question of fact and rests in the sound discretion of the regulatory agency, *Providence Gas Co. v. Burman*, R.I., 376 A.2d 687, and we conclude that the cities did not err in applying the ⅛ rule in the instant case.

█ The company contends that the cities erred in failing to make an allowance for the compensating balances that the

company is required to maintain in certain banks with which it maintains lines of credit. The cities have responded by pointing to the fact that the company made no claim for the inclusion of an allowance for this item in its case in chief and that the only support for the claim was by way of a brief reference during rebuttal testimony to the effect that the average cash balance in the three banks in question during the test year period totaled $898,121. The cities contend that this casual reference, unsupported by any testimony by company officials or bank officers concerning the amount of compensating balances required and the commercial necessity for such balances, was an insufficient basis upon which to justify the inclusion of the amount claimed within the rate base. There is authority for the cities' treatment of the company's claim. For example, in Niagara Mohawk Power Corp., 87 PUR 3d 189 (N.Y.1970), the New York Public Service Commission said:

> "If shown clear and convincing proof of the need to maintain these balances and the amount required in these accounts, this commission will give careful consideration to the allowance . . . . We would want, for example, testimony of bank officers that such balances are required to be maintained . . . . Evidence also should be submitted concerning the use which is made of the funds borrowed which result in these balances." 87 PUR 3d at 193.

In Kansas Power & Light Co., 8 PUR 4th 337 (Kan.1975), the Kansas State Corporation Commission refused to add a compensating bank balance to the rate base in the absence of evidence that the balance was not subject to withdrawal. Although the company has cited authority for the proposition that compensating bank balances are properly includable as part of working capital, see, e. g., Public Service Co. of Colorado, 13 PUR 4th 40 (Colo.1975), and although we do not necessarily agree with the cities that proof of the necessity for the compensating balances need rise to the level of being clear and convincing, we cannot say that the cities' refusal to accept the attenuated rebuttal testimony on this issue as satisfying the company's burden of proof was arbitrary, capricious or unreasonable. See *New England Telephone & Tel. Co. v. Dept. of Public Utilities*, 360 Mass. 443, 275 N.E.2d 493.

## Material and Supplies as Working Capital

▆ The company contends that the cities erred in treating materials and supplies as a part of working capital and in offsetting them by tax accruals. As has already been discussed above, however, investors in a utility are entitled to a return only on those funds supplied by them, and to the extent that the funds have in effect been supplied by the ratepayers no return thereon should be allowed. This reasoning was followed by the Iowa Supreme Court in upholding the offset of tax accruals against materials and supplies in the *Davenport Water Co.* case, supra, and we cannot say that the cities acted arbitrarily, capriciously or unreasonably in following that approach in the instant case. See also *Pacific Telephone & Tel. Co. v. Public Utilities Com'n*, supra; and *City of Cincinnati v. Public Utilities Com'n*, supra.

## Treatment of Investment Tax Credit

▆ The cities deducted from rate base a total of $362,922 in the form of an accumulated three percent investment tax credit. The company contends that it should have been permitted to "normalize" the tax credits by amortizing them over the life of the property the investment in which gave rise to the credits. The company argues that the purpose of the investment credit was to serve as an incentive to investment in new plant and that therefore the tax credit should be utilized to benefit the investors who provide the funds for such investments. Under the company's rationale, ratepayers are not entitled to benefit because they receive a pro rata portion of the tax credit over the life of the property which gave rise to the credit and which was constructed with investor supplied funds. The effect of the cities' treatment of the accumulated investment tax credit is to "flow through" to the present ratepayers

the benefits accruing from the tax savings resulting from the tax credit against the company's income tax liability. These concepts were discussed by the Rhode Island Supreme Court in the second *Rhode Island Consumers' Council v. Smith* case, supra:

" 'Flow through' and 'normalization' are part of the ratefixer's everyday jargon. Under 'normalization' the utility used the allowable liberalized depreciation to its advantage by taking the difference between taxes actually paid and the higher taxes reflected for ratemaking purposes as a cost of service and setting up the difference in its records as a deferred tax account. This account is then used as a source to supply a specific amount of depreciation over a specified period of time. It is obvious that the establishment of such an account obligates the utility to acquire funds to maintain that account. A principal source of these funds is the rates charged the consumer. However, when the flow-through technique is employed, the full benefit of the tax credit is immediately bestowed upon the customer. Farris & Sampson, Public Utilities—Regulation, Management & Ownership, 113–14 (1973).

. . . . .

". . . The Commission balanced the obvious benefit to the consumer by a one-shot advantage of decreasing the rate base by some $747,000 for one year, against giving the consumer a long-term benefit that will extend over a number of years while at the same time giving the utility the use of the unamortized funds which will hopefully be used to generate further income and thereby reduce the cost of service. Flow through increases the revenue only for the test period but creates a revenue gap for the years that follow. It is a short-range approach to the problem, while the long-term normalization affords greater hope for stabilization of rates in the future." *Rhode Island Consumers' Council v. Smith*, 113 R.I. 384, 389, 322 A.2d 17, 20.

The Rhode Island court went on to conclude that the commission's approval of the utility's normalization of the tax credit was a matter within the commission's discretion and was not arbitrary or unreasonable. Other courts have upheld the decisions of regulatory agencies that had the effect of reducing a utility's rate base by the amount of the unamortized portion of the investment tax credit. See, e. g., *New England Telephone & Tel. Co. v. Dept. of Public Utilities*, supra; *City of Pittsburgh v. Pennsylvania Public Utilities Com'n*, 208 Pa.Super. 260, 222 A.2d 395; *Williams v. Washington Metropolitan Area Transit Com'n*, 134 U.S.App.D.C. 342, 378–83, 415 F.2d 922, 958–63; *Pacific Telephone & Tel. Co. v. Public Utilities Com'n*, supra, 62 Cal.2d at 634, 44 Cal.Rptr. at 1, 401 P.2d at 375–77. The company points to the fact that in 1964 Congress amended the investment tax credit law by providing that federal regulatory agencies should in effect use the normalization approach contended for by the company in the instant case. See Historical Note to 26 U.S.C.A. § 38; Pub.L. No. 88–272, Title II, § 203(e), February 26, 1964, 78 Stat. 35.

We conclude that in electing to adopt the approach followed by other jurisdictions rather than permitting the company to amortize or normalize the investment tax credit, the cities did not act arbitrarily, capriciously or unreasonably, although it would appear that the treatment of the tax credit proposed by the company might well result in greater equity to investors and ratepayers. See, e. g., *Public Service Co. of New Hampshire v. State*, 113 N.H. 497, 311 A.2d 513; *Rhode Island Consumers' Council v. Smith*, 113 R.I. 384, 322 A.2d 17.

### Cost of Purchased Power

The company contends that the cities understated the company's cost of electric power purchased wholesale for sale to its customers. We agree.

The company made adjustments in the test year expenses to reflect the substantial increases in purchased power costs that the company had experienced under the new contracts it had entered into with its suppliers effective November 1, 1973. To reflect

these additional costs, the company proposed an adjustment of $2,163,424, based upon estimates of a twelve month period ending in October of 1974. At the time of the rate hearing in March of 1974, four months of this period had already elapsed. The company selected the November 1973-October 1974 period in order to demonstrate the true future purchased power costs, as the company had experienced a one hundred percent increase in the cost of purchased power in the period between September of 1973 and November of 1973. More specifically, the average cost in mills per kilowatt hour of purchased power during the period from July through November of 1973 was as follows: July, 3.4619; August, 4.3886; September, 3.3561; October, 7.1164; November, 8.0222.

The cities selected a twelve month period ending in June of 1974 upon which to base adjustments to purchased power costs. The cities' adjustments totaled $1,426,763. The difference of $736,661 between the cities' and company's adjusted purchased power costs resulted in a dollar-for-dollar decrease in that amount in the company's revenue requirements for its electric department.

In reaching their adjusted cost figures, the cities utilized the July, August, and September, 1973 costs in arriving at the average cost of purchased power in mills per kilowatt hour, even though the cities' witness on this issue acknowledged that costs as low as those of the July-September 1973 period would not be experienced again in the foreseeable future.

The cities argue that they were more than generous in basing post test year adjustments upon six months of post test year known costs in 1973 and six months of estimated costs during the January-June 1974 period and that to permit the company to base adjustment upon projections extending some sixteen or seventeen months beyond the end of the test year period would be contrary to all accepted regulatory practices.

■ In *Application of Northwestern Bell Telephone Co.,* 78 S.D. 15, 98 N.W.2d 170, we stated that in determining prospec-

tive rates the regulatory agency could make adjustments in test year figures. The court held in that case that the Public Utilities Commission had exceeded its authority in not including within the rate base the cost of property whose use was imminent at the close of the test year.

The Minnesota Supreme Court recently discussed adjustments in test year data in the following language:

"The test-year concept is designed to produce a measure of a regulated utility's earnings for a known period of time, to enable the regulatory body to make an accurate prediction of revenues and expenses in the reasonably near future. Based upon the evidence presented, the regulatory body undertakes a reasoned exercise of its discretion in altering test-year data to reflect changes of known magnitude occurring subsequent to the test year." *Northwestern Bell Telephone Co. v. State,* Minn., 253 N.W.2d 815, 822.

In a case in which the regulatory agency had failed to consider all of the increased wage and salary expense during the test year, the Rhode Island Supreme Court held that:

"The object of test-year figures is to reflect typical conditions. Since a test period is employed to show what the probable operating and financial condition of Narragansett will be in the immediate future, in order that rates may be fixed which will compensate the company for all operating expenses and provide it with a fair return, the test year must be representative of the conditions which will prevail in the immediate future when those rates will be effective. . . . We do not doubt that in order to arrive at an accurate calculation of expenses, the necessity of a test year is evident. On the record before us, we have only the Public Utilities Commission rejecting the annualization put forth by Narragansett and basing its decision as to the estimated operation expense, i. e., the wage and salary adjustments on the actual payments made for the last nine months of 1972. We see such as error. A failure to

consider the first quarter of 1972 presents a false picture with reference to the future expenses that Narragansett may incur. Therefore, we remand this matter to the Commission with a direction to allow a full amount of the wage and salary adjustment." *Rhode Island Consumers' Council v. Smith,* 113 R.I. 384, 397, 322 A.2d 17, 24. (citation and footnote omitted).

The purpose of using a test year is to establish with a reasonable degree of accuracy the revenue and expenses that a utility will experience during the period when the new rates will be in effect. Although the cities' witness attempted to justify the use of the July-September 1973 cost of purchased power figures in determining the company's future costs for such power, we conclude that in view of his admission that those low costs would not be experienced again within the foreseeable future it was arbitrary, capricious and unreasonable for the cities to utilize those figures in making adjustments to the company's future cost of purchased power.

### Increased Payroll Costs

The company contends that the cities erred in eliminating the company's adjustments to operating expenses that reflected increased payroll and related expenses in the amount of $434,360 that became effective July 1, 1973. A witness for the cities testified that these increased costs, the amount and certainty of which are not in dispute, would be offset by increased worker productivity and possible gains in efficiency through the adoption of technological improvements. Although it has been held that such offsets to increased costs are proper when established by the record, see, e.g., *Pacific Telephone & Tel. Co. v. Public Utilities Com'n,* supra, we view the testimony of the cities' witness regarding this question as resting more upon speculation and assumption than upon fact or reasonably demonstrable projections.

The company's witnesses testified that any increase in productivity was recognized and reflected in the block type rate design employed by the company, whereby increased sales units of power to a given customer are priced at lower prices per unit to reflect the lower labor costs of providing such increased amounts of power. Moreover, the company's evidence demonstrated that the growth in kilowatt hour sales per customer was substantially less than it had been in the past and that it was below that projected in the company's 1974 budget. In short, we conclude that the cities' finding that the known increased costs of payroll would be offset by assumed increases in productivity and efficiency was not supported by substantial evidence and therefore must be set aside.

### Deduction of Interest Expense on Construction Work in Progress

"Construction work in progress" is a term used to describe that portion of utility plant in the process of construction but not yet placed in service. A utility is generally not allowed to earn a return on such construction until it is actually placed in service. Cf. *Application of Northwestern Bell Telephone Co.,* 78 S.D. 15, 98 N.W.2d 170. There remains the question of how to treat the interest expense incurred on the funds borrowed for such construction. The company elected to capitalize the interest expense in question, amounting to $411,946, by adding the cost of the funds used during construction to the cost of the completed facilities and then recovering this cost through annual depreciation charges. By following this approach, the company argues, future customers receive the tax benefit when the constructed facilities are placed in service. The company claims to have made an allocation of tax benefits between present and future customers by utilizing a "net-of-tax" or "after tax" rate in capitalizing the allowance for funds used during construction. To arrive at this net-of-tax figure, the company computed the net cost of that portion of the cost of funds attributable to bond borrowing by deducting from the weighted cost of the bond

borrowing the effect of the forty-eight percent federal income tax payable on corporate income. This process is illustrated by one of the company's exhibits:

NORTHWESTERN PUBLIC SERVICE COMPANY
ALLOWANCE FOR FUNDS USED DURING CONSTRUCTION
COMPONENTS OF 7.5% RATE
JUNE 30, 1973 TEST YEAR

| Line No. | | Per Cent of Total Capitalization (1) | Cost | Weighted Gross Rate | After Tax Rate | Line No. |
|---|---|---|---|---|---|---|
| 1 | Bonds | 54.36 | 8.168% (2) | 4.440 | 2.309% (3) | 1 |
| 2 | Preferred Stock | 10.83 | 7.625% | .826 | .826% | 2 |
| 3 | Common Equity | 34.81 | | | 4.365% | 3 |
| 4 | Total | 100.00 | | | 7.500% | |

(1) Ten Year Average—Exhibit B, Statement 17, Page 4–19
(2) Exhibit B, Statement 17, Page 4–19
(3) Gross Cost of Bonds as Reduced by Tax Effect of 48%

The cities took the position that the cost of interest on construction work in progress should be deducted in full in the year in which it is accrued. The cities rejected as being unsupported by the record the company's claim that the 7.5% interest rate used as an allowance for funds used during construction was an after tax rate.

■ In many respects, the argument here resembles the dispute over the treatment of the investment tax credit. The company argues that the "normalization" or capitalization of the interest expense is the only method by which both present and future ratepayers will be treated equitably. The cities contend that by not reducing current federal income taxes payable by the full amount of current interest payable the cost of taxes which the current ratepayers are required to pay is overstated. There is support for the method adopted by the cities. See *New England Telephone & Tel. Co. v. Dept. of Public Utilities Com'n,* supra; *Rhode Island Consumers' Council v. Smith,* 113 R.I. 384, 322 A.2d 17. Accordingly, as with the cities' treatment of the investment tax credit, we cannot conclude that the cities' inclusion of the $411,946 as a tax deduction in computing the allowable cost of service was arbitrary, capricious or unreasonable. Moreover, the cities did not

err in concluding that the company had not established by competent proof the validity of the 7.5% net-of-tax figure.

*Amortization of Rate Case Expense*

■ The cities ruled that the company must amortize its expenses associated with the hearing on the rate increase over a three year period. The company contends that it should be allowed to amortize those expenses over a one and one-half year period, arguing that because of the more frequent need to file rate increases in the wake of recent inflationary cost increases in the utility industry, rate hearing expenses should be amortized over that time span related to the period during which the asked-for rates will be in effect. The company has cited a number of regulatory decisions that have permitted one and two year amortization periods for such expenses. See, e.g., Central Vermont Public Service Corp., 7 PUR 4th 67 (Vt.1974); Southern Connecticut Gas Co., 12 PUR 4th 355 (Conn. 1975); Connecticut Natural Gas Corp., 11 PUR 4th 66 (Conn.1975); Midstate Telephone Co., Inc., 10 PUR 4th 88 (N.Y.1975). The cities point to those decisions that support their claim that amortization periods of from three to four years are still common. See, e.g., Sierra Pacific Power Co., 7

PUR 4th 209 (Cal.1974); Potomac Edison Co., 6 PUR 4th 183 (W.Va.1974). We conclude that the fixing of the amortization period was a matter within the discretion of the cities and that the company has not established that the cities abused their discretion in deciding upon the three year period.

### Rate of Return

 Finally, the company alleges that the rate ordinances adopted by the cities produce an inadequate rate of return on the company's investment when measured against the standards set forth by the United States Supreme Court in the Bluefield, Hope, and Permian Basin Area cases, supra, and by this court in the Northwestern Bell Telephone Co. cases, supra. The cities argue that the rate of return provided by the ordinances satisfies the requirements expressed in these cases.

The company's witnesses testified to rates of return on common stock equity in the range of 13.5% to 14%. The cities found that the company should be entitled to a 12.1% rate of return on common stock equity, resulting in an 8.79% rate of return on the electric department rate base. Based upon the evidence presented to them, we cannot say that the cities acted arbitrarily, capriciously or unreasonably in fixing this rate of return. Accordingly, we will not disturb the cities' determination on this issue.

### Procedure on Remand

 Although the use of post test period data on remand has been criticized as subversive of the ratemaking process, we agree with the statement of the Rhode Island court that "whether it is reasonable to consider post test year data may depend on the circumstances involved." New England Telephone & Tel. Co. v. Public Utilities Com'n, R.I., 376 A.2d 1041, 1047. This case is unique in that the cities' authority to fix rates terminated on July 1, 1975. We are concerned here with neither the prospective application of a rate order nor the protection of the ratemaking process from an

unending cycle of updating. Rather, the cities' redetermination on remand of the erroneous portions of their orders and of any resulting effects on the rates themselves is, in effect, merely the reassessment of the necessity for, and magnitude of, any refund that may be owing from the company to its customers. See # 11956, State ex rel. South Dakota Electric Consumers v. Northwestern Public Service Co., S.D., 265 N.W.2d 882, opinion filed this day. Furthermore, since the original determinations of the purchased power and payroll costs were no more than forecasts, we believe that it would make little sense for the cities on remand to make speculative "predictions" of costs that have already occurred. New England Telephone & Tel. Co. v. Public Utilities Com'n, supra, 376 A.2d at 1047. Accordingly, under the special circumstances of this case, we conclude that expediency will be served if the cities base their determinations of the company's purchased power and payroll costs on data reflecting costs actually experienced over the period during which these rates were effective.

### Conclusion

The judgment is reversed and the case is remanded to the circuit court with directions to remand for further action consistent with this opinion.

BRANDENBURG and JONES, Circuit Judges, concur.

DUNN, C. J., and ZASTROW, J., dissent.

BRANDENBURG, Circuit Judge, sitting for PORTER, J., disqualified.

JONES, Circuit Judge, sitting for MORGAN, J., disqualified.

DUNN, Chief Justice (dissenting).

I would affirm the cities' rate ordinances. As to the cost of power purchases, the period proposed by the company for measuring the costs extended up to 17 months beyond the end of the test year being used to measure the other factors. As this court pointed out in Application of Northwestern Bell Telephone Co., 1959, 78 S.D. 15, 29, 98

N.W.2d 170, 178, " * * * the purpose of the cutoff date is to provide a time when plant, revenues, and expenses can be correlated." To allow consideration of one factor for such a long period of time beyond the test-year cutoff date without considering all the other factors for that same period would result in a false picture of the company's rate structure. *Pacific Telephone & Telegraph Co. v. Public Utilities Commission*, 1965, 62 Cal.2d 634, 44 Cal.Rptr. 1, 401 P.2d 353. The cities had the discretion to allow adjustments to the test year, and I would hold that their discretion was not abused in refusing to accept the company's lengthy adjustment to the test year.

Similarly, I would hold that the cities did not abuse their discretion in eliminating the payroll cost increases. They were presented with conflicting evidence on the issue of whether these increases would be balanced out by increased worker productivity and gains in efficiency through technological improvements and chose to follow the evidence presented by their witness that such an offset would occur. This was not an abuse of discretion in my opinion.

I am authorized to state that Justice ZASTROW joins in this dissent.