BLUE CROSS & BLUE SHIELD OF DELAWARE, INCORPORATED, Appellant,

v.

David H. ELLIOTT, Insurance Commissioner of the State of Delaware, Appellee.

Superior Court of Delaware, New Castle County.

Submitted: Dec. 21, 1983.

Decided: April 30, 1984.

Max S. Bell, Jr., and John J. Schreppler, II, of Richards, Layton & Finger, Wilmington, for appellant.

Catherine S. Mullholland, Deputy Atty. Gen., for appellee.

TAYLOR, Judge.

By decision dated March 17, 1983 the Delaware Insurance Commissioner [Commissioner] held that rates which appellant Blue Cross & Blue Shield [Blue Cross] had filed were excessive under 18 *Del.C.* § 2503 and allowed a lesser rate increase. The parties have submitted briefs and had oral argument.

I

An initial issue raised by Blue Cross is whether the Commissioner's decision should be reversed because the Commis-

sioner was disqualified from deciding this matter. The issue of disqualification was raised by Blue Cross during the rate proceedings. Blue Cross contends that shortly after a dispute was resolved between the Commissioner and Blue Cross over the availability of coverage for Commissioner's son, the Commissioner began to evidence strong public hostility to Blue Cross and its rate positions.

The Commissioner attached to his decision on the rate filing, an order denying the Blue Cross motion to disqualify. The order concluded that (1) the Commissioner could not disqualify himself from performing his statutory duty since no statutory mechanism existed for disqualification other than by impeachment, and (2) the actions of the Commissioner did not reflect bias or prejudgment of the issues which were inherent in the frequent rate filings of Blue Cross. The Commissioner indicated that any prior problem concerning his son's coverage had been resolved and that he and his son have coverage. The Court has not been supplied with evidentiary material which refutes the Commissioner's findings.

Blue Cross also contends that press releases made by the Commissioner before and during the pendency of this matter indicate prejudice or prejudgment which requires the decision to be reversed.

At the outset, it is noted that the Insurance Department has a duality of functions, one, overseeing the conduct of the insurance industry affecting the public in this State, and second, assuring that the rates are not excessive, inadequate or unfairly discriminatory, and in the performance of its protecting the public a segment of the Department may be called upon to take an advocacy or adversary position while the Commissioner or someone in the Department must perform an adjudicatory function. 1 Cooper, *State Administrative Law* 338–343; *New Jersey State Board of Optometrists v. Nemitz*, N.J.Super., 21 N.J.Super. 18, 90 A.2d 740 (1952); *Dayoub v. Com., State Dental Council, etc.*, Pa.

Comm., 70 Pa.Cmwlth. 621, 453 A.2d 751 (1982).

Blue Cross cites fourteen communications from either the Commissioner or the Deputy Commissioner. These communications make it clear that the Department was becoming more active or aggressive in coping with rapidly increasing health care costs. The Department sought more detailed information concerning the Blue Cross operation. It disapproved various Blue Cross filings on the ground that the information had not been provided. It appears that the Department obtained the services of a consultant, James H. Hunt, to make a comparative analysis of Blue Cross's financial operation. It also announced a public information program designed to stimulate competition in the health care insurance industry. Blue Cross sees these actions as a personal vendetta by the Commissioner. On the other hand, the Commissioner asserts that Blue Cross has received particular attention because it is a major provider of health care protection, but that filings of other insurers had also been disapproved.

With respect to the statements which announced the Commissioner's disapproval of certain Blue Cross filings, while they addressed the issues and gave an explanation for the disapproval, I do not find that they precluded due consideration of the evidence which might be introduced at the ultimate hearing. Clearly, the system which contemplates the exercise of an early disapproval necessitates some preliminary adjudication of the issues. Finally, the Commissioner's efforts to obtain support for legislation giving the Commissioner greater control is legitimate conduct on the part of an elected official concerning the powers of his office and is not disqualifying conduct.

It should be noted that a party to an adjudicatory proceeding, such as the Blue Cross rate hearing, is entitled to a determination which is free from bias or prejudice. Cooper, *State Administrative Law*, pp. 338–343, 344–346. Moreover, the

official or body which is charged with conducting and deciding matters must guard against making pronouncements which indicate a prejudgment of the pending matter. Ibid. If that restrictive requirement is violated, appellate review will scrutinize the administrative action to assure that no miscarriage of justice has occurred. Ibid, pp. 348–350.

■ The Court does not find that the actions of the Commissioner and Department in singling out Blue Cross for critical comment of the nature involved here warrants disqualifying an elected official from performing his statutory duty of rate surveillance. However, in view of this background, the Court is called upon to scrutinize the hearing record to determine whether the decision is a miscarriage of justice.

II

■ Blue Cross contends that the test in determining the propriety of rates is whether the rates fall within the range of reasonableness. The Commissioner does not dispute this standard. The disagreement arises in applying that range. 18 *Del.C.* § 2503(a)(2) requires that "[r]ates shall not be excessive, inadequate or unfairly discriminatory." Therefore, permissible rates are those which are not unfairly discriminatory and are less than excessive and more than inadequate. The rates must be the product of "due consideration" of the several factors enumerated in 18 *Del.C.* § 2503(a)(3).[1] The statute contemplates a plurality of rates based on the considerations enumerated in paragraph (3), particular systems of express provisions of different insurers (paragraph (4)), risk classifica-

tions (paragraph (5)), or other reasonable classifications (subsection (b)).

■ The function of the Commissioner is to review the insurer's filings "to determine whether they meet the requirements" of the statute. 18 *Del.C.* § 2506(a). The Commissioner must apply this standard to determine whether or not the insurer's filed rates are "excessive, inadequate or unfairly discriminatory" and whether the filing otherwise fails to meet the requirements of the statute. *Elliott v. Blue Cross,* Del.Supr., 463 A.2d 273 (1983).

In this case the Commissioner found that Blue Cross had not given proper weight to various factors which were entitled to consideration and had based the rates on unsupported assumptions and that as a result thereof the filed rates were excessive. Therefore, the record must be examined to determine whether the Commissioner's conclusion finds support in the record.

With respect to the factors which may be considered in connection with filing and review of rates, it has been noted above that a number of factors are entitled to consideration, including past and prospective loss experience within and outside this State, reasonable margin for contingencies, past and prospective expenses both countrywide and those specially applicable to this State, and other relevant factors within and without this State. 18 *Del.C.* § 2503(a)(3).

Blue Cross contends that the Commissioner erroneously accepted the approach of the Department's expert witness, James Hunt, and rejected Blue Cross evidence. Blue Cross characterizes Mr. Hunt's testimony as a "personal social policy approach" and challenges his emphasis upon (1) Blue Cross's failure to negotiate with

1. (3) Due consideration shall be given:
 a. To past and prospective loss experience within and outside this State;
 b. To the conflagration and catastrophe hazards;
 c. To a reasonable margin for underwriting profit and contingencies;
 d. To dividends, savings or unabsorbed premium deposits allowed or returned by in-

surers to their policyholders, members or subscribers;
 e. To past and prospective expenses both country-wide and those specially applicable to this State;
 f. To all other relevant factors within and outside this State;

doctors, (2) judging administrative expenses on "trends in the economy" and his impression that Blue Cross is a high expense operation, and (3) reduction of allowable reserves to encourage cost containment.

■ With respect to Blue Cross's objection to the Commissioner's reliance on trends in the economy, it must be recognized that prospective expenses, both countrywide and applicable to this State, are considerations listed in 18 *Del.C.* § 2503(a)(3)e. The Commissioner's consideration of this factor was proper.

Blue Cross takes issue with the Commissioner's acceptance of Mr. Hunt's "impression" that Blue Cross is a "high expense" operation. Blue Cross points to testimony of Mr. Heck at the stay hearing which shows the "loss ratio" standard which is applied to all other insurers range between 55% and 70%, while applying that same loss ratio standard to the rates which Blue Cross had filed would produce a much more favorable loss ratio of 85%. While this testimony is not a part of the Commissioner's record, it is indicative of evidence which would have been in the record if Blue Cross had been afforded the opportunity to introduce evidence applying the "loss ratio" standard.

### III

Blue Cross contends that the Commissioner's allowance of a reserve equivalent to one month's expenses does not properly apply 18 *Del.C.* § 2503(a)(3) and violates 18 *Del.C.* § 6305. The Commissioner found that the Blue Cross reserve of 11 million dollars represented 0.8 month's expenses, and he determined that a one-month reserve was proper. Blue Cross's filed rates contemplated a two-month reserve. Apparently the Blue Cross reserve has been declining for more than two years, reaching .8 month at the time of the hearing and .6 month at the end of 1982. This means that, assuming the moneys were drawn from the reserve for payment for medical services rendered to Blue Cross

coverage holders, the reserve money went to pay expenses which would normally be paid from current premiums. Therefore, in part the current premiums were not paying the current expenses.

Turning to 18 *Del.C.* § 6305, that section contains a prerequisite for issuance of a certificate of authority to operate a nonprofit health service corporation that the "amount of money actually available for working capital is sufficient to carry on the plan for a period of 2 months from the date of issuance of the certificate of authority". The Commissioner contends that this provision only applies during the initial stage of the business, and that it is not a continuing requirement. The Commissioner further points out that the statute refers to "working capital" and does not refer to "reserve".

The Commissioner distinguishes these terms, stating that working capital "represents the money provided by company investors to meet day-to-day delivery of utility service," citing *Central Maine Power Company v. Public Utilities Comm.*, Me. Supr., 433 A.2d 331, 345, (1981), while reserve means an amount "kept back and held available for future use ... to meet a specified or anticipated liability," citing *Long v. City of Fresno*, D.Ct.App.Cal., 225 Cal.App.2d 59, 36 Cal.Rptr. 886 (1964). *Central Maine*, supra, makes it clear that in the context of a private corporation working capital is a fund from which day-to-day expenses are paid and that it represents capital paid by the company's investors. In the field of accounting, working capital "is the excess of [a business's] current assets over its liabilities." Finney, *Principles of Accounting*, p. 55. In the public utility field working capital means the funds necessary to enable it to meet current obligations as they arise and to operate economically and efficiently. *Alabama-Tennessee Natural Gas Co. v. Federal Trade Commission*, 3d Cir., 203 F.2d 494 (1953); *Okmulgee Gas Co. v. Corporation Commission*, Okl.Supr., 95 Okl. 213, 220 P. 28 (1923); *Northwestern Public Ser-*

*vice Co. v. Cities of Chamberlain, Huron, Mitchell, Redfield, Webster and Yankton,* S.D.Supr., 265 N.W.2d 867 (1978); *Davenport Water Co. v. Iowa State Commerce Commission,* Iowa Supr., 190 N.W.2d 583 (1971); *Southern New England Tel. Co. v. Public Utilities Commission,* Conn.Supr., 29 Conn.Sup. 253, 282 A.2d 915 (1970); *South Hinds Water Co. v. Mississippi Public Service Com'n,* Miss.Supr., 422 So.2d 275 (1982).

The Commissioner's contention that a reserve is money which is held back for a particular or specified liability fails to recognize the varied applications for which reserves are established. Reserves are used for a variety of purposes to accomplish a variety of objectives. Finney, *Principles of Accounting,* p. 473–5. They may be established to cover anticipated bad debts, actual liabilities, anticipated or contingent liabilities or losses. Ibid. Reserves are generally created by a charge against an asset or income account. Ibid, p. 480. Thus, a reserve is a specified amount shown on the records of the corporation designated for a particular purpose. Ibid. It may or may not be accompanied by a separate fund. Ibid, p. 483–4. Reserves may be created for payment of current liabilities to be paid out of the general fund. Ibid.

Thus, the working capital required by 18 *Del.C.* § 6305(4) may properly be described as a fund and reserve for the payment of current or operating expenses. The Commissioner contends that this provision only applies to newly created health service corporations and that the requirement is not a continuing requirement. The only references to "working capital" are found in paragraphs (3) and (4) of § 6305. They read:

(3) The amounts provided as working capital of the corporation are repayable, without interest, only out of operating revenues;

(4) The amount of money actually available for working capital is sufficient to carry on the plan for a period of 2 months from the date of issuance of the certificate of authority.

Paragraph (4) requires working capital sufficient to carry on the plan for two months from the issuance of the certificate. The more literal interpretation of that language is that the only period protected by the working capital is the initial 2-month period. However, the contention could be made that the language referring to the initial 2-month period related to the required amount of working capital and not to the termination of the working capital requirement and that under such construction there was a continuing requirement that the working capital in that amount be retained. Paragraph (3) permits repayment of the "amounts provided as working capital" but "only out of operating revenues". The inference is that the original working capital cannot be repaid as such. Therefore, to the extent that it is not exhausted in the payment of expenses it remains as working capital. However, the statute makes no provision for replenishing the portion of the original working capital which is exhausted. Although it would be a realistic requirement that a minimum amount of working capital be continuously maintained, I conclude that a fair construction of the statute does not produce that result. Therefore, the Commissioner's decision not to permit establishment of a 2-month reserve does not violate 18 *Del.C.* § 6305.

The Commissioner does not contend that Blue Cross should not maintain a reserve. The issue is whether the Commissioner acted within his sound discretion in disapproving a 2-month reserve and limiting the projected reserve to a 1-month reserve. It is noted that New Hampshire has provided by statute for a contingency reserve fund of no less than 8% and no more than 16% of annual premium income. *N.H.-Vermont Health Service v. Com'r of Ins.,* N.H. Supr., 122 N.H. 268, 444 A.2d 508 (1982). 8% of the annual premiums represents approximately 1 month of premiums, and 16% represents approximately 2 months of pre-

miums. No such standard is provided in the Delaware statute. *Blue Cross & Blue Shield of Michigan v. Demlow,* Mich.Supr., 403 Mich. 399, 270 N.W.2d 845, 856 (1978) points out that where no statutory standard exists for the reserve the Commissioner may "determine actuarially the level of reserves necessary to insure that the corporation could fulfill the commitments which it had made and set reserves at that level."

 The Commissioner noted that there was evidence that the National Blue Cross/Blue Shield organization recommended a 3-month reserve but that the national average reserve for Blue Cross plans , was about 1 month. The Commissioner based his disallowance of a 2-month reserve on the national average reserve of 1 month, the absence of a compelling reason to have a greater reserve, and the cost containment value of a lean reserve. The purpose of the reserve is not to provide a "slush fund" to be readily drawn upon, but to provide a protection against adverse contingencies and for providing needed improvements and for research and development of new and improved health care programs. Therefore, the desire to enforce frugality is not a recognized consideration in determining a proper reserve. Since the decision did not address the customary considerations in passing upon a reserve, the Commissioner's decision with respect to the reserve must be set aside.

### IV

 Blue Cross contends that the filed rates should be treated as approved by virtue of the Commissioner's failure to disapprove rates filed in May 1982 which applied the same criteria as the rates under consideration here. The response of the Commissioner is that the May 1982 filing increased rates by 13.2% while the filing involved here increased rates by at least 19.4%. I do not find that the Commissioner is bound by any principle of res judicata, stare decisis or estoppel which precluded full consideration of the filing involved here, based upon the failure to disapprove the May 1982 rates.

 Blue Cross contends that the Commissioner using Mr. Hunt's approach has sought to apply a different standard to this rate filing than the Commissioner had applied to Blue Cross previously. While the Commissioner is not required to adhere solely to an approach that he had previously followed, basic fairness calls for reasonable notice to the party affected and reasonable opportunity to address the pertinent considerations. In this instance, it appears that Mr. Hunt's report was made available early in the hearing and that Blue Cross was afforded reasonable opportunity to present evidence addressing the subjects covered by Mr. Hunt's report and testimony.

### V

 Blue Cross also contends that the Commissioner could not change the standard by which the Blue Cross rate filing would be considered without having previously adopted a rule promulgating that policy. Blue Cross cites *Delaware Real Estate Com'n v. Patterson-Schwartz & Assoc., Inc.,* Del.Supr., 344 A.2d 242 (1975). *Patterson* is not applicable to prospective rate making, because it involved an attempt to discipline a licensed professional for conduct which at the time of the occurrence was not prohibited but which was thereafter prohibited by Commission rule. However, to the extent that the action of the Commissioner seeks to penalize or adjust future rates for past action or inaction which preceded the establishment of such policy, it is an impermissible action. *Application of Blue Cross for Change of Rates,* Ohio Ct.App., 44 Ohio App.2d 375, 338 N.E.2d 775 (1974). It is clear that in part, at least, the Commissioner based his decision which disapproved these filed rates upon the past record of Blue Cross which was consistent with considerations which had either been tolerated in the past or had

not been heretofore raised by the Commissioner.

█ Where a change of policy is being instituted those affected should be informed of such policy change and afforded reasonable opportunity to demonstrate compliance therewith before being subjected to what in effect is disciplinary action through the rate disapproval procedure.

## VI

█ Finally, Blue Cross contends that this decision unfairly discriminated against it by applying a different standard than that which the Commissioner applies to all other health insurers. It appears that after the Blue Cross hearing and before the Commissioner's Blue Cross decision, the Commissioner adopted the loss ratio test for other increases. Under the "loss ratio" standard rates are tested based upon the percentage of premium which is paid in benefits, compared with the percentage of premium used for purposes other than benefits. In view of the Commissioner's adoption of the loss ratio before the Blue Cross decision, Blue Cross was entitled to the opportunity to show that its rates met that test. *Manor Care, Inc. v. State of Delaware*, Del.Super., C.A. No. 81A–MY–5, Walsh, J. (Aug. 20, 1981).

█ With respect to Blue Cross's contention that the Commissioner's decision is discriminatory because it gives different treatment to other insurers than to Blue Cross, it is noted that although the decision did not address that issue, the Commissioner's news releases stressed the desirability of having competition in the health service field. This would be best accomplished on a non-discriminatory basis by applying similar standards to all within the field, starting from a consideration of their similarities rather than from their dissimilarities. Following this approach, the more effective attack upon the problem of rapidly increasing health care cost would be by unified action by all who provide that type of coverage and not by a single provider. To do otherwise, in the absence of strong differentiating considerations, would be prima facie unfairly discriminatory and would violate 18 *Del.C.* § 2503(a)(2).

## VII

█ Blue Cross points to certain actions by the Commissioner during the conduct of the hearings which it contends violate the Administrative Procedure Act, 29 *Del.C.* Ch. 101. Blue Cross points out that the Commissioner refused to hold a pre-hearing conference as authorized by 29 *Del.C.* § 10125(b)(6). While such a conference may aid and shorten the hearing, it is not mandatory and is not a fatal defect. Next, Blue Cross points out that public witnesses were not sworn and cross examination was not permitted. Due process requires that any testimony which may be considered in reaching an administrative decision should be sworn and must be subjected to cross examination. 73A *C.J.S.* Public Administrative Law & Practice § 131, p. 53; *Parsons v. Board of Zoning Appeals*, Conn.Supr., 140 Conn. 290, 99 A.2d 149 (1953). Blue Cross also contends that the Commissioner improperly permitted the public to testify at the hearing. This argument centers upon 18 *Del.C.* § 2507, which provides for a hearing on filed rates, but only provides for notice to the insurer and rating organization involved in the rate filing; and 18 *Del.C.* § 2520, which provides for the filing of an application for a hearing by "any person or organization in interest aggrieved with respect to any filing which is in effect". Although these sections do not provide for public participation except by application, 29 *Del.C.* § 10117 gives to an agency such as this Department and Commissioner discretion to hold public hearing and §§ 10124 and 10125 provide for the notice and power to conduct such public hearings. I do not find that the Commissioner exceeded his authority in permitting public testimony in

a matter of public impact, such as the cost of health insurance protection.

## VIII

 Uppermost in the Commissioner's decision is his desire to contain health care costs. This is a worthy objective which most would not challenge. The more difficult issue is the manner in which that objective can be pursued. Health care costs have risen at a substantially higher rate than many other costs. The function of the health service corporation or any insurance company providing similar service is to pay for the services which the holders of its coverage properly incur. The extent of the service is governed by the health of the participants and the coverage specified in the participants' contracts. The cost of the service is governed by the financial terms worked out between the health service corporation or insurer and the hospitals, physicians and others who provide the services. Assuming that corrective action by the Commissioner is within the current statutory power of the Commissioner, cf. *Application of Blue Cross for Change of Rates,* supra; *Blue Cross & Blue Shield of Michigan v. Demlow,* supra; the action should produce a unified, non-discriminatory effort by those who are competitors in the field of providing health care protection. The decision in this case does not purport to be such an effort and because of its prima facie discriminatory nature violates 18 *Del.C.* § 2503 and must be reversed.

## IX

Based on the foregoing considerations, the decision of the Insurance Commissioner is reversed and the matter is remanded to the Insurance Commissioner for further proceedings consistent herewith and the stay heretofore entered shall remain in effect upon the terms provided therein until further action is taken by the Commissioner consistent herewith.

Blue Cross shall submit an appropriate form of order upon notice or consent.